# IN THE SUPREME COURT OF TEXAS

═══════════════
No. 14-1006
═══════════════

IN RE STACEY BENT AND MARK BENT, RELATORS

═══════════════════════════════════════════════
ON PETITION FOR WRIT OF MANDAMUS
═══════════════════════════════════════════════

**Argued November 4, 2015**

JUSTICE BROWN delivered the opinion of the Court.

JUSTICE JOHNSON did not participate in the decision.

In recent years this Court has sought to protect the constitutional right to a trial by jury by requiring trial courts to provide litigants with "an understandable, reasonably specific explanation" for setting aside a jury verdict and ordering a new trial. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 213 (Tex. 2009). Generally, this requirement is satisfied when a trial court's stated reason is "a reason for which a new trial is legally appropriate" and "is specific enough to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand." *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012). When a new-trial order satisfies these facial requirements, we have further empowered appellate courts to "conduct a merits review of the bases for a new trial order" and grant mandamus relief "[i]f the record does not support the trial court's

rationale for ordering a new trial." *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 749 (Tex. 2013).

In this case, the court of appeals concluded the trial court abused its discretion in ordering a new trial because each basis for doing so was either facially insufficient or could not withstand a *Toyota* merits review. Relators Stacey and Mark Bent now ask us to uphold the trial court's new-trial order and both parties seek this Court's guidance on the scope of the merits review we established in *Toyota*. Specifically, the parties have inquired as to the court of appeals' authority, within the context of an abuse-of-discretion standard of review, to re-weigh evidence considered by the trial court in determining whether there is insufficient evidence to support a jury's finding or that a finding is against the great weight and preponderance of the evidence. We ultimately do not reach that issue because we conclude the bases for the trial court's order implicating factual-sufficiency analysis did not comply with the facial requirements we established in *Columbia* and *United Scaffolding*. Therefore, we need not determine whether the court of appeals properly conducted its merits review of those bases. Though we would not have been as generous in applying our facial-requirements precedents, we nonetheless agree with the court of appeals' ultimate disposition of the trial court's bases for a new trial. Accordingly, we deny the Bents' mandamus petition.

## I

Stacey and Mark Bent owned a home in Piney Point Village, a small municipality surrounded by Houston's sprawling city limits. The Bents' home, purchased in 2005 and insured by USAA, suffered a hurricane, a flood, and eventually foreclosure. Their dispute with USAA spans each of these unfortunate events.

This case began as a routine claim on a homeowner's policy for damage sustained in September 2008 from Hurricane Ike. A USAA adjuster inspected the Bents' home and assessed damages at $14,302.33. Not included in this amount was the cost of removing fallen trees on the Bents' lot, which the adjuster told the Bents their policy did not cover. USAA sent the Bents two letters on October 23, 2008: one informing them that USAA had approved their claim, and another including a $1,162.33 check to cover the Bents' claim minus their one-percent deductible.

The Bents' home later sustained flood damage in April 2009. The homeowner's policy at issue in this case did not cover flood damage; however, the Bents held a separate flood-insurance policy with an affiliated carrier. While repairing the flood damage, workers discovered mold within the walls of the Bents' home. At trial, the Bents argued that Ike-related roof damage, undiscovered by USAA, caused water to leak into the home, which eventually developed into mold.

USAA re-inspected the house in May 2009. Based on that inspection, USAA approved an additional payment. Furthermore, and contrary to the previous adjuster's representation, the adjuster told the Bents their homeowner's policy did in fact cover at least some of the tree-removal costs. Once again, USAA issued two letters—one notifying the Bents of claim approval and another with a $49,471.67 check—on June 6, 2009.

The following month USAA received notice from Stacey claiming additional Ike-related damage had been discovered. USAA performed a third inspection of the house on July 21, 2009. And as before, USAA revised its estimate and again separately issued, on July 25, 2009, a claim-approval letter and apparently issued a $11,072.78 check the day before.

On October 1, 2009, the Bents again contacted USAA regarding additional and previously unclaimed Ike-related damage. This time, however, USAA took the position that it could not consider the new claim without more specific itemization of the alleged damage. After a series of letters and phone calls, the Bents requested yet another inspection, and USAA obliged. At this November 11, 2009 re-inspection, the adjuster explained what additional information was needed for USAA to consider the Bents' claim. After receiving nothing further from the Bents, USAA invoked the policy's appraisal provision. USAA finally heard from the Bents in December 2009 when their attorney sent a letter contesting USAA's right to an appraisal.

Negotiations wore on between USAA and the Bents' first attorney, and then with the Bents themselves, and then with a second attorney retained in July 2010. Following yet another re-inspection, USAA sent a letter to the Bents' counsel in August 2010 presenting a "revised dwelling estimate," detailing $136,539.41 in damages attributable to Hurricane Ike, which USAA asked counsel to "review . . . with Mr. and Mrs. Bent." After accounting for depreciation and the Bents' deductible, USAA stated it was "prepared to send an additional actual cash value payment" of $27,416.86, an amount that would bring total payments made by USAA to $89,123.64. In the letter, USAA described that amount as an "actual cash value settlement" and stated: "The Loss Settlement Provision stipulates that the loss to your covered property be settled at actual cash value." Unlike with USAA's previous letters, no concurrent payment accompanied this one. USAA argued at trial that the August 2010 letter was a settlement offer not payable without the Bents' acceptance. But the Bents did not accept the offer and instead sued USAA for breach of their homeowner's policy and various violations of the Texas Insurance Code. In March 2012, with litigation ongoing, USAA

4

nonetheless mailed the Bents a check for $27,416.86 plus interest. USAA characterizes this payment as "an unsuccessful attempt to resolve the claim . . . even though the Bents never indicated any agreement with USAA's proposed compromise."

As this saga between the Bents and USAA unfolded, the Bents were also dealing with the City of Piney Point Village's restrictions on their efforts to repair their home. After Ike, Stacey met several times with Annette Arriaga, Piney Point Village's director of planning, development, and permits and secretary of both the city's Planning and Zoning Commission and Board of Adjustments. These meetings culminated in a June 2010 letter from Arriaga to the Bents informing them that the city estimated the extent of the damage triggered an ordinance requiring the home to be rebuilt one foot above the floodplain in which it sat. Arriaga further wrote that she was "apprehensive about the [overall] health and welfare of the structure" and recommended the home be "replaced" or "re-built." The Bents therefore argued their home was, in effect, a total loss.

In late 2010 the Bents stopped making mortgage payments and their lender foreclosed on their home. The Bents' case against USAA, however, proceeded to trial. At its conclusion, the jury found that USAA had not breached the homeowner's policy but that it did make a "statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact" in violation of chapter 541 of the Insurance Code. This finding was apparently based on the initial adjuster's misrepresentation that the Bents' policy did not cover tree removal. Based on this finding, the jury awarded damages of $150,000 for the diminished value of the home and $250,000 for mental anguish. The jury further awarded the Bents $185,000 in attorney's fees through trial but awarded no appellate attorney's fees.

The trial court initially entered judgment on the jury's verdict but later granted the Bents' motion for new trial. The trial court gave five bases in its order: (1) the jury's finding that USAA did not breach the homeowner's policy was contrary to the great weight and preponderance of the evidence; (2) USAA violated the trial court's order in limine regarding the Bents' failure to seek a variance from the relevant Piney Point Village city ordinance; (3) the evidence did not support the jury's award for the diminished value of the Bents' home; (4) the jury improperly failed to award appellate attorney's fees; and (5) the jury's finding as to mental-anguish damages was not supported by a finding that USAA "knowingly" violated the Insurance Code, a predicate for which both sides failed to argue.

USAA sought relief from the court of appeals. Concluding the trial court abused its discretion on each of its bases for ordering a new trial, the court of appeals conditionally granted a writ of mandamus directing the trial court to vacate its order and render judgment on the jury's verdict. The Bents then sought relief from this Court, arguing that the trial court acted within its discretion on every basis except for the mental-anguish-damages predicate, which the Bents do not present for our review.

## II

Trial courts have traditionally been afforded broad discretion in granting new trials. *See Columbia*, 290 S.W.3d at 210 (citing *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985)). Our rules of civil procedure vest trial courts with broad authority to order new trials "for good cause" and "when the damages are manifestly too small or too large." TEX. R. CIV. P. 320. Historically, trial courts sometimes granted new trials with little or no explanation, and "[o]ur

6

decisions approved the practice of trial courts failing to specify reasons for setting aside jury verdicts." *Columbia*, 290 S.W.3d at 208.

The Texas Constitution, however, guarantees that the right to trial by jury "shall remain inviolate." TEX. CONST. art. I, § 15. It follows that trial judges cannot enjoy unfettered authority to order new trials. Within the past decade, this Court's jurisprudence has evolved to more firmly secure Texans' constitutional right to a jury trial in the new-trial context. In *Columbia*, we acknowledged trial judges' authority to order new trials is "not limitless." 290 S.W.3d at 210. We also held that, at the very least, parties to a jury trial "are entitled to an understandable, reasonably specific explanation why their expectations are frustrated by a jury verdict being disregarded or set aside, the trial process being nullified, and the case having to be retried." *Id.* at 213.

Our holding in *Columbia* arose from an order premised on the bare assertion that a new trial was "in the interests of justice and fairness." *Id.* at 206. We concluded that "such a vague explanation in setting aside a jury verdict does not enhance respect for the judiciary or the rule of law, detracts from transparency we strive to achieve in our legal system, and does not sufficiently respect the reasonable expectations of parties and the public when a lawsuit is tried to a jury." *Id.* at 213. We further held that "the significance of the issue—protection of the right to jury trial"— justified mandamus review under the circumstances. *Id.* at 209.

We expanded on the trial court's obligation in *In re United Scaffolding.* In that case we held a trial court does not abuse its discretion in ordering a new trial "so long as its stated reason for granting a new trial (1) is a reason for which a new trial is legally appropriate (such as a well-defined legal standard or a defect that probably resulted in an improper verdict); and (2) is specific enough

7

to indicate that the trial court did not simply parrot a pro forma template, but rather derived the articulated reasons from the particular facts and circumstances of the case at hand." 377 S.W.3d at 688–89.

We went on in *United Scaffolding* to identify examples in which a new-trial order would amount to an abuse of discretion, such as when: (1) "the given reason, specific or not, is not one for which a new trial is legally valid"; (2) "the articulated reasons plainly state that the trial court merely substituted its own judgment for the jury's"; or (3) "the order, though rubber-stamped with a valid new-trial rationale, provides little or no insight into the judge's reasoning." *Id.* at 689. We also made several observations about what a facially valid new-trial order looks like. We rejected a *Pool*-like standard of review, which would require trial courts to "'detail the evidence relevant to the issue in consideration.'" *Id.* at 687 (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)). Rather, we took the view that a trial court "need not provide a detailed catalog of the evidence" as long as it provides a "cogent and reasonably specific explanation" of its reasoning. *Id.* at 688. Accordingly, we counseled reviewing courts to focus "not on the length or detail of the reasons a trial court gives, but on how well those reasons serve the general purpose of assuring the parties that the jury's decision was set aside only after careful thought and for valid reasons." *Id.* (citing *Columbia*, 290 S.W.3d at 213).

In urging quality over quantity, however, we did not relieve any trial court of its responsibility to point to evidence that played a pivotal role in its decision. We noted that "mere recitation of a legal standard, such as a statement that a finding is against the great weight and preponderance of the evidence, will not suffice." *Id.* at 689. To be facially valid, a new-trial order

8

based on a factual-sufficiency review "must indicate that the trial judge considered the specific facts and circumstances of the case at hand and explain how the evidence (or lack of evidence) undermines the jury's findings." *Id.*

In *In re Toyota* we took the next logical step: deciding "whether, on mandamus review, an appellate court may evaluate the merits of a new[-]trial order that states a clear, legally appropriate, and reasonably specific reason for granting a new trial." 407 S.W.3d at 757. In other words, "if a trial court's order facially comports with *Columbia* and *United Scaffolding*, may an appellate court review the correctness of the stated reasons for granting a new trial?" *Id.* We concluded that "[h]aving already decided that new[-]trial orders must meet these requirements and that noncompliant orders will be subject to mandamus review, it would make little sense to conclude now that the correctness or validity of the orders' articulated reasons cannot also be evaluated." *Id.* at 758. To do otherwise "would mean that a trial court could set aside a verdict for reasons that are unsupported by the law or the evidence, as long as those reasons are facially valid." *Id.* Accordingly, we held "[a]ppellate courts must be able to conduct merits-based review of new[-]trial orders" and if "a trial court's articulated reasons are not supported by the underlying record, the new[-]trial order cannot stand." *Id.*

We acknowledged that while the new-trial order in *Toyota* satisfied the facial requirements elucidated by *Columbia* and *United Scaffolding*, "the record squarely conflict[ed] with the trial judge's expressed reasons for granting [a] new trial." *Id.* at 759. That expressed reason was that Toyota's counsel "willfully disregarded" and "brazenly and intentionally violated" a limine order that precluded introduction of a police officer's deposition testimony regarding the plaintiff's seat-

belt usage. *Id.* at 761. However, the record revealed it was the plaintiff's attorney—not Toyota's—who introduced the deposition testimony by reading it into the record when making an offer of proof under the rule of optional completeness, and afterward failed to object or ask for a curative or limiting instruction. *Id.* at 760–61. Toyota's counsel then referred to the deposition testimony in subsequent witness examinations and closing arguments. When plaintiff's counsel protested, the trial court ruled the evidence was part of the record and Toyota was no longer prohibited from referencing it. *Id.* We agreed with Toyota that the record clearly established Toyota never violated the trial court's limine order. Accordingly, the expressed basis for the new-trial order was unsupported and thus the order itself was invalid. *Id.*

The Bents correctly point out a distinction between *Toyota* and this case. In *Toyota*, the record "directly contravene[d]" the basis for the new-trial order. *See id.* at 761. But here, several of the trial court's rulings are based on a conclusion that the jury's findings were against the great weight and preponderance of the evidence—a conclusion implicating the shades of gray inherent in weighing evidence and the appropriate level of deference afforded a trial court's estimation of that evidence. Accordingly, the Bents ask "[h]ow exacting can or should an appellate court's review be when there is no direct conflict" between the record and the stated bases for a new trial. We do not directly engage that question because in this case we do not proceed beyond holding that the trial court's order was facially insufficient. However, we observe that merits review is not uncharted territory; on the contrary, we recognized in *Toyota* that "it is old hat to our colleagues on the federal bench." *Id.* at 758. And those courts do not hesitate to review new-trial orders based on factual-sufficiency analyses. *See id.* at 759 (discussing *Cruthirds v. RCI, Inc.*, 624 F.2d 632, 635, 636 (5th

10

Cir. 1980)). We have not adopted the Fifth Circuit's approach to merits review and do not suggest that more cannot be said on the subject, but appellate courts are hardly without precedent to guide them.

Importantly, this Court has never suggested merits review of new-trial orders should be conducted under anything other than the abuse-of-discretion standard that is familiar and inherent to mandamus proceedings. *See Walker v. Packer*, 827 S.W.3d 833, 839–42 (Tex. 1992). *Columbia*, *United Scaffolding*, and *Toyota* all broke new ground, but they did so within an abuse-of-discretion framework. In *Toyota* we opened the gates to reviewing the merits of a new-trial order, but we did not create a new standard of review. Indeed, we concluded in *Toyota* that the trial court "abused its discretion" because its "stated reasons, though complying in form with the requirements of *Columbia* and *United Scaffolding*, lacked substantive merit." *Toyota*, 407 S.W.3d at 762. Accordingly, it is inaccurate to say, as one court of appeals has suggested, that we have "enunciated a new standard of review for intermediate appellate courts to use in implementing [our] directive: the 'merits-based review.'" *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 150 (Tex. App.—Houston [14th Dist.] 2014, mand. filed) (orig. proceeding). "Merits review" was simply a reference to the new authority granted to courts of appeals to consider, in mandamus proceedings, whether the record supports the trial court's rationale for ordering a new trial. *See Toyota*, 407 S.W.3d at 749. It is not a new standard of review; the abuse-of-discretion standard applies to merits review just as it does in all mandamus proceedings.

11

# III

## A

We now turn to the trial court's bases for granting a new trial. The first was the jury's finding that USAA did not breach the Bents' homeowner's policy—a conclusion the trial court deemed "so contrary to the great weight and preponderance of the evidence in this case as to be clearly wrong and manifestly unjust." The trial court's determination on this point apparently turned on its reading of the policy's prompt-payment provision, which the trial court quoted as follows:

> If we notify you that we will pay your claim, or part of your claim, we must pay within 5 business days after we notify you. If payment of your claim or part of your claim requires the performance of an act by you, we must pay within 5 business days after the date you perform the act.

From that provision and the evidence presented at trial, the trial court drew the following conclusions concerning the jury's finding that USAA did not breach the policy:

> Hurricane Ike hit the Texas coast on September 13, 2008. The testimony of Stacey Bent established that Plaintiffs made an insurance claim within days of that event and that Defendant notified Plaintiffs it would pay Plaintiffs' claim. Further, the testimony of Stacey Bent and the individual adjusters on the claim established that six different, and increasing, estimates were made by Defendant between the initial estimate on October 6, 2008, and the final estimate on August 28, 2010, and none of Defendant's payments to Plaintiffs were made within the required 5 business days.
>
> Defendant did not offer any testimony to controvert Plaintiffs' evidence that Defendant failed to make the required payment within 5 business days.

The court of appeals decided this explanation satisfied *Columbia* and *United Scaffolding*'s facial requirements but, after conducting a merits review, ultimately determined the trial court's rationale was unsupported by the record. *In re United Servs. Auto Ass'n*, 446 S.W.3d 162, 171–72 (Tex.

App.—Houston [1st Dist.] 2014). We think the court of appeals was too generous—the trial court's explanation is insufficient on its face.

First, the trial court's explanation suggests a muddled legal- and factual-sufficiency evaluation of the evidence. A reference to the "great weight and preponderance of the evidence" signals a factual-sufficiency analysis, but the remainder of the explanation gives the impression USAA breached the policy as a matter of law. The trial court concluded Stacey's testimony "established" the Bents made a claim and USAA notified them it would pay, but that "none of Defendant's payments to Plaintiffs were made within the required 5 business days." The trial court further asserted that USAA "did not offer any testimony to controvert Plaintiffs' evidence that Defendant failed to make the required payments within 5 business days." If true, it appears judgment notwithstanding the verdict, not a new trial, was appropriate. If the Bents conclusively established their claim, and USAA presented no contrary evidence, the trial court has not articulated "a reason for which a new trial is legally appropriate." *See United Scaffolding*, 377 S.W.3d at 688–89.

Furthermore, if the trial court believed, as it obviously did, that no payment was made within five days after USAA notified the Bents a payment was forthcoming, its duty was to "explain how the evidence (or lack of evidence) undermines the jury's findings." *See id.* at 689. The trial court failed to do so. It noted the Bents made a claim "within days" after Hurricane Ike and that USAA "notified Plaintiffs it would pay Plaintiffs' claim." But this muddy reference to USAA's notification "provides little or no insight into the judge's reasoning." *See id.* With no mention of when the notification occurred or in what capacity it was made, the parties must speculate as to which of the many contacts between USAA and the Bents triggered the five-day prompt-payment provision. We

reiterate that the trial court is not obligated to provide a "detailed catalog of the evidence." *Id.* at 688.

However, in a case where liability turns on a specific event occurring on a specific date and the

passage of a fixed amount of time after that event, something more than simply stating that USAA

"notified Plaintiffs it would pay Plaintiffs' claim" is required. As it is, the trial court's explanation

does little to "assur[e] the parties that the jury's decision was set aside only after careful thought and

for valid reasons." *See id.*

The trial court ostensibly provides more explanation, but only through a vague reference to

"six different, and increasing, estimates . . . between the initial estimate on October 6, 2008, and the

final estimate on August 28, 2010." From this, the trial court proclaims that "none of [USAA's]

payments to Plaintiffs were made within the required 5 business days." Yet there is no indication that

"estimates" have any bearing on *notification* under the prompt-payment provision, which turns not

on an estimate but when a policyholder is actually notified that their claim was approved. At worst,

the trial court's explanation is based on a misreading of the policy that results in a legally improper

basis for ordering a new trial. At best, it never rises to a "cogent and reasonably specific explanation"

of the trial court's reasoning and inspires no confidence that the trial court "derived the articulated

reasons from the particular facts and circumstances of the case at hand." *See id.* at 688–89. Simply

put, the trial court never pinpoints the events or dates it believed triggered USAA's prompt-payment

obligation. On the contrary, its explanation serves only to suggest the trial court failed to properly

ascertain the nature of that provision.

Because we conclude the trial court's explanation did not meet *Columbia* and *United*

*Scaffolding*'s facial requirements, we need not determine if the trial court's rationale is supported

14

by the record. The court of appeals, however, undertook that review and concluded that the record did not support the trial court's rationale. Specifically, the court of appeals concluded the record directly contravened the trial court's assertion that USAA "did not offer any testimony to controvert Plaintiffs' evidence that [USAA] failed to make the required payments within 5 business days." In actuality, USAA's claim records were admitted into evidence and showed USAA simultaneously issued checks on the Bents' claims each time USAA approved payments in October 2008 and June 2009, and issued a July 2009 payment the day before the Bents were notified USAA would make a payment. The court of appeals concluded "the record contains no evidence that USAA ever notified the Bents that it would pay a claimed amount and then failed to make a timely payment in that amount." *United Servs. Auto Ass'n*, 446 S.W.3d at 172. The court of appeals deemed the evidence "inconclusive" as to whether the Bents were required to take additional action before USAA was obligated to pay the amount approved in its August 2010 letter, noting testimony from USAA's corporate representative that the letter constituted a settlement attempt, not an unconditional agreement to pay the approved amount. Based on its review of the evidence, the court of appeals concluded  the trial court "[did] not actually identify any evidence tending to show that USAA did not comply with the loss payment provision of the policy." *Id.* at 173. The court of appeals also held that the trial court's statement that USAA did not offer any evidence to the contrary was incorrect, as USAA "offered such evidence in the form of the claims log and [the corporate representative's] testimony regarding the log, the timing of payments, and the August 2010 letter." *Id.*

We do not pass judgment on the court of appeals' review of the record; we need not consider it to conclude that the trial court's order was facially insufficient. We acknowledge, however, the

15

Bents' argument that trial courts should be granted deference in concluding a jury finding was against the great weight and preponderance of the evidence or insufficiently supported by the evidence. We can hardly disagree with that general proposition, but an appellate court does not necessarily re-weigh the evidence presented at trial simply by conducting a merits review of a factual-sufficiency-based new-trial order. Here, the trial court claimed USAA offered *no* evidence contradicting the Bents' evidence that USAA failed to comply with the prompt-payment provision. The court of appeals concluded this was demonstrably untrue and identified contradictory evidence in the record. It was not necessary to re-weigh the evidence concerning USAA's payments to conclude the trial court's claim is unsupported by the record. *See Toyota*, 407 S.W.3d at 749 ("If the record does not support the trial court's rationale for ordering a new trial, the appellate court may grant mandamus relief."). The amount of deference given to a trial court's evaluation of the evidence will likely be a point of contention in review of some new-trial orders, but it is not implicated in *every* review of an order ostensibly based on a factual-sufficiency analysis.

**B**

The second basis for a new trial given by the trial court was that USAA violated the court's limine order when it discussed a potential variance to Piney Point Village's city ordinance that effectively required the Bents' home to be rebuilt in light of the damage it sustained. The trial court's order noted that the Bents filed a motion in limine seeking to prevent USAA from making "[a]ny reference to, or insinuation regarding, [the Bents] not attempting to get a variance from the Piney Point ordinance requiring the house be brought up to code, or argument or insinuation that they could have, or should have, attempted to get one, or would have received one if they had tried." The trial

16

court stated it granted the motion in part, "specifically requiring USAA to approach the bench before raising such issues." Nevertheless, the trial court stated that "counsel raised the variance subject with [Arriaga] in an attempt to suggest [the Bents] could have, or would have, gotten a variance if they had applied for one," and "spent a considerable amount of time discussing the variance issue in closing." The trial court further provided examples by way of quoting USAA's counsel's argument from the record, including statements such as:

- "It's interesting that they want consequential damages when they never gave us these documents, when they never sought a variance, when [Arriaga] tells us the City of Piney Point gives variances for flood damage and other natural disasters."
- "[T]he last question asked of Ms. Arriaga was, 'Does the City of Piney Point ever grant a variance?' And she said—remember?—'Oh, yes, for natural disasters, like floods.' They give them a variance. That means they don't have to demolish the house just because it's one foot below the level."
- "[W]e asked [Arriaga] on cross-examination, 'Isn't it true that not a single contractor has come into Piney Point and asked you to pull a permit on this house, asked to do any work on this house or asked you for a variance of this house?' And Ms. [Arriaga] said, 'No. No. No.'"

The trial court declared USAA's questioning of Arriaga invited "pure speculation" and that there is no evidence in the record to support counsel's closing argument. Accordingly, the trial court concluded that "USAA's jury argument on the issue of variance was improper" and "materially prejudiced Plaintiffs."

Because the trial court's order was "specific" and a "violation of an order in limine can serve as the basis of a new[-]trial order," the court of appeals concluded *Columbia* and *United Scaffolding* were satisfied. *United Servs. Auto Ass'n*, 446 S.W.3d at 174–75. In this instance we agree. Unlike the prompt-payment provision, we can ascertain both an appropriate legal basis for the trial court's

17

ruling and understand why the trial court made it. Like the court of appeals, we must next turn to the record and determine if it supports the trial court's explanation.

After an examination of the record, the court of appeals determined the trial court indeed granted the Bents' motion in limine in part. But contrary to the trial court's statement that the limine order "specifically requir[ed] USAA to approach the bench before raising such issues," the trial court actually allowed USAA more latitude. The following exchange regarding the Bents' motion in limine took place at a pre-trial conference:

> USAA'S COUNSEL: I mean, I think it's absolutely relevant to ask whether or not they got a variance or requested a variance. I think that is absolutely within—
> THE COURT: I don't have a problem with that. I think—
> USAA'S COUNSEL: As far as the routine activities of the board—I think that's something that we could approach the bench with at the time, and if Ms. Arriaga is prepared or qualified to answer that, then we can proceed in that regard.
> THE COURT: Yeah. I'm not going to limine out the entire issue of a variance, but whether or not they would've, all that— those kind of questions, you're going to have to talk with me about—
> USAA'S COUNSEL: Absolutely.
> THE COURT: —before you come up. So sort of granted in part and denied in part.

The trial court suggests USAA first violated its limine order by raising the variance issue while questioning Arriaga "in an attempt to suggest [the Bents] could have, or would have, gotten a variance if they had applied for one." The trial court further stated it sustained the Bents' objection when USAA questioned Arriaga regarding a variance. But the court of appeals' review of the record revealed the Bents did not actually object to any part of USAA's questioning of Arriaga concerning variances, nor did they object to USAA's closing argument. Our review of the record confirms that conclusion. Furthermore, USAA asked only "whether residents of Piney Point can request variances, whether Arriaga educated the Bents regarding this fact, whether Stacey ever requested a variance,

18

and what factors the Board of Adjustments considers when deciding whether to approve a variance." *Id.* at 175. Because the trial court's order only limited questions as to whether the Bents would have received a variance if they applied for one, we agree with the court of appeals that USAA did not violate the order by asking whether the Bents *could have* requested one.

We further agree with the court of appeals that USAA's closing argument did not violate the limine order. USAA's counsel reminded the jury that the Bents never applied for a variance, even though Arriaga testified variances are sometimes granted after natural disasters. Importantly, USAA's counsel never said the Bents would have been granted a variance had they applied for one. Moreover, once Arriaga's testimony was admitted "without objection or a request that it be stricken or that the jury be instructed to disregard—it was in [the record] for all purposes and a proper subject of closing argument." *See Toyota*, 407 S.W.3d at 760.

We agree with the court of appeals that the record clearly establishes USAA did not violate the limine order, and in fact directly controverts the trial court's stated rationale for ordering a new trial.

## C

The trial court's third basis for ordering a new trial is that the evidence does not support the jury's $150,000 award to the Bents for their home's diminished value. On this the parties agreed, and the trial court acknowledged USAA argued the jury should have awarded no damages while the Bents argued the only evidence placed the diminished value in excess of $900,000. The trial court explained its ruling as follows:

19

The Court agrees that the $150,000.00 damage award seems arbitrary, given the evidence that was presented. But the Court is not inclined to substitute its opinion for that of the jury. Texas Rule of Civil Procedure 320 specifically provides that "new trials may be granted when the damages are manifestly too small or too large." The Court believes that the damages awarded by the jury for diminished value of [the Bents'] home was not supported by the evidence at trial.

The court of appeals concluded this explanation passes muster under *Columbia* because it is "specific enough both to permit USAA to attack it and to enable our review of it" but fails under *United Scaffolding* because it does not "'elaborate, with reference to the evidence adduced at trial, how the jury's answers are contrary to the great weight and preponderance of the evidence.'" *United Servs. Auto Ass'n*, 446 S.W.3d at 176 (quoting *United Scaffolding*, 377 S.W.3d at 690). That is, the court of appeals concluded that while the order "discusses the parties' arguments as to what the evidence showed," it "does not actually discuss the evidence itself." *Id.*

We agree. The trial court's explanation makes no reference to the evidence at all. It offers only the conclusory comment that the jury's award "seems arbitrary." Rule 320 does permit a trial court to grant a new trial when "damages are manifestly too small or too large," but the trial court does not specify which scenario applies here and makes no effort to point to any evidence supporting its rationale. The trial court's opinion that the jury's award "seems arbitrary" does not amount to a "cogent and reasonably specific explanation of the reasoning that led the court to conclude that a new trial was warranted." *See United Scaffolding*, 377 S.W.3d at 688. Nor does it provide the parties any assurance "that the jury's decision was set aside only after careful thought and for valid reasons." *See id.* Again, we reiterate that the trial court need not "provide a detailed catalog of evidence" to support its reasoning. *See id.* But here the court offered *none*. Accordingly, we agree with the court

20

of appeals that the trial court abused its discretion by ordering a new trial based on the jury's diminished-value award.

**D**

The trial court's final basis for a new trial was the jury's failure to award the Bents appellate attorney's fees. The trial court found this oversight "erroneous and against the overwhelming weight of the evidence." It explained:

> Texas Civil Practice and Remedies Code Sections 38.001-38.003 mandates an award of attorney's fees when a Plaintiff prevails on a breach of contract claim. Sections 541 and 542 of the Texas Insurance Code have similar provisions. When a statute mandates an award of trial attorney's fees, an award of appellate attorney's fees is likewise mandatory. (citations omitted).

> Since [the Bents] prevailed on their Section 541 claims, they were entitled to an award of attorney's fees for trial and through appeal. Moreover, as was mentioned above, the Court finds that USAA breached the insurance agreement as a matter of law. The jury answered "no" to the breach of contract question. Thus, it is unclear how that answer affected the total attorney's fees awarded by the jury ($185,000). That number may very well have been higher had the jury properly answered the breach of contract question. In any event, the jury could not legitimately award $0.00 for Plaintiffs' attorney's fees on appeal.

We have already confirmed the trial court abused its discretion by ordering a new trial based on the jury's finding that USAA did not breach the policy. Because much of the trial court's analysis is contingent on that first basis, the references to attorney's-fees provisions in the Civil Practice and Remedies Code, as well as the prompt-payment provisions in chapter 542 of the Insurance Code, no longer apply. Reducing the trial court's reasoning to the statutory provisions and analysis thereof as consistent with the jury's answers, the order essentially becomes:

> The jury awarded $0.00 for Plaintiffs' attorney's fees. This award was erroneous and against the overwhelming weight of the evidence. . . .

21

> Sections 541 . . . of the Texas Insurance Code ha[s] [a] similar [mandatory attorney's fees] provision[ ]. When a statute mandates an award of trial attorney's fees, an award of appellate attorney's fees is likewise mandatory. . . .
> Since [the Bents] prevailed on their Section 541 claims, they were entitled to an award of attorney's fees for trial and through appeal.

Although the trial court again couches its conclusion in factual-sufficiency nomenclature ("against the overwhelming weight of the evidence"), its rationale for ordering a new trial turns on a legal conclusion: that chapter 541 mandates an award of attorney's fees based on, in this case, the jury's determination that USAA made "a statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact."

The court of appeals considered the trial court's explanation facially sufficient. We cannot agree. Chapter 541 of the Insurance Code provides that a prevailing plaintiff "may obtain . . . reasonable and necessary attorney's fees." TEX. INS. CODE § 541.152(a)(1). We assume "may obtain" renders an attorney's-fee award mandatory, *see Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998), but by its own terms it is not automatic—a prevailing party bears the burden to establish the fees are "reasonable and necessary," *see Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 819 (Tex. 1997) ("[T]he plaintiff must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case at bar, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment."). And a jury does not necessarily err in awarding no attorney's fees if the party seeking them fails to establish its requested fees are "reasonable and necessary." *See Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d 315, 320–24 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Cain v. Pruett*, 938 S.W.2d 152, 159–60 (Tex. App.—Dallas 1996, no writ). Accordingly, absent any reference to what evidence was

22

adduced as to reasonable and necessary attorney's fees, the failure to award attorney's fees under a mandatory-fee statute is not in itself a reason for which a new trial is legally appropriate. *See United Scaffolding*, 377 S.W.3d at 689 ("[A]n order granting a new trial may amount to a clear abuse of discretion if the given reason, specific or not, is not one for which a new trial is legally valid."). Here, the order summarily states that evidence supporting an award of reasonable and necessary attorney's fees is "overwhelming." This is insufficient; the order "must indicate that the trial judge considered the specific facts and circumstances of the case at hand and explain how the evidence (or lack of evidence) undermines the jury's findings." *Id.* at 689. The trial court made no such effort, rendering this basis for a new trial facially insufficient.

* * *

We conclude that three of the trial court's bases for ordering a new trial fail to satisfy the facial requirements set forth in *Columbia* and *United Scaffolding*. On the remaining basis, we agree with the court of appeals that the record does not support the trial court's stated rationale. The trial court abused its discretion and the court of appeals acted appropriately in conditionally granting mandamus relief directing the trial court to vacate its order and enter judgment on the jury's verdict. Accordingly, we deny the Bents' petition for writ of mandamus.

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED:  April 1, 2016

23