

# NUMBER 13-20-00237-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

### IN RE FRANK TORRES, M.D. AND
### SAN BENITO MEDICAL ASSOCIATES, INC.

### On Petition for Writ of Mandamus.

## MEMORANDUM OPINION

### Before Justices Hinojosa, Perkes, and Tijerina
### Memorandum Opinion by Justice Perkes[1]

Relators Frank Torres, M.D. and San Benito Medical Associates, Inc., filed a petition for writ of mandamus in the above cause on June 11, 2020, seeking to compel the trial court to withdraw its "Amended Order Granting Motion for New Trial" in favor of plaintiff and real party, Enrique Linan, individually and as heir of Laura Linan, deceased.[2]

---

[1] *See* TEX. R. APP. P. 52.8(d) ("When denying relief, the court may hand down an opinion but is not required to do so," but "[w]hen granting relief, the court must hand down an opinion as in any other case"); *id.* R. 47.4 (distinguishing opinions and memorandum opinions).

[2] This original proceeding arises from trial court cause number 2017-DCL-01084 filed in the 103rd District Court and transferred to the 357th District Court of Cameron County, Texas. The respondent in this original proceeding is the Honorable Juan A. Magallanes.

Relators contend, in short, that the jury's verdict was supported by factually sufficient evidence, and the trial court impermissibly substituted its judgment for that of the jury in granting a new trial. After performing a merits-based review of the trial court's order in accordance with *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 755–59 (Tex. 2013) (orig. proceeding), we conditionally grant the petition for writ of mandamus.

## I. BACKGROUND

This original proceeding arises from a health care liability claim filed against relators by real party. Laura passed away at the age of thirty-nine on November 2, 2015. Her autopsy indicates she died as a result of a pulmonary thromboembolism.[3] Laura's autopsy also revealed a "12 x 7 cm mural uterine leiomyoma" and an "obscuration of the adjacent ovarian and fallopian tube structures by fibrosis."

At a jury trial, real party argued that Laura's death was caused by the negligence of nurse practitioner Goldie Strader and family physician Dr. Torres in failing to timely diagnose and treat Laura's pulmonary embolism. Relators argued, conversely, that real party failed to prove their burden that either Strader or Dr. Torres acted imprudently or unreasonably in their treatment of Laura, and real party was negligent in not seeking immediate care after Laura's symptoms warranted emergency medical intervention. The jury unanimously found that no party was negligent.[4]

---

[3] A pulmonary embolism is a potentially life-threatening "blockage in one of the pulmonary arteries in your lungs," and in "most cases, pulmonary embolism is caused by blood clots that travel to the lungs from deep veins in the legs or, rarely, from veins in other parts of the body (deep vein thrombosis)." *Pulmonary Embolism*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/symptoms-causes/syc-20354647 (last visited Sept. 13, 2020).

[4] The jury was instructed as follows:

Did the negligence, if any, of those named below proximately cause the death of Laura Linan?

2

Real party filed a motion for new trial, arguing in relevant part, that there was factually insufficient evidence to support the jury's verdict, that the verdict was against the overwhelming weight of the evidence, and that the admission of irrelevant and unsupported scientific opinions tainted the evidence and resulted in an improper verdict. Following two hearings on the matter, respondent granted real party's motion for new trial on September 27, 2019. An original proceeding ensued, and on April 2, 2020, this Court held that the respondent's new trial order was facially invalid, conditionally granted the petition for writ of mandamus, and directed the respondent to vacate its new trial order and conduct further proceedings consistent with our opinion. *See In re Torres*, No. 13-20-00019-CV, 2020 WL 1615667, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 2, 2020, org. proceeding) (mem. op.). On May 8, 2020, respondent signed an order vacating the September 27, 2019 new trial order and issued an "Amended Order Granting Motion for New Trial." This original proceeding followed.

## II.    MANDAMUS

Mandamus is an extraordinary remedy. *In re H.E.B. Grocery Co.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding) (per curiam). Mandamus relief is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Christus Santa Rosa Health Sys.*, 492 S.W.3d 276, 279 (Tex. 2016) (orig. proceeding). The relator bears the burden of proving these requirements. *In re H.E.B. Grocery Co.*, 492 S.W.3d at

---

You are instructed that you may not consider the decision to not have the surgery to remove the uterine mass in the determination of the negligence, if any, of Enrique or Laura Linan.

Answer "Yes" or "No" for each of the following:

Dr. Frank Torres ___
Goldie Strader ___
Enrique Linan ___
Laura Linan ___

302; *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). An abuse of discretion occurs when a trial court's ruling is arbitrary and unreasonable or is made without regard for guiding legal principles or supporting evidence. *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding); *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). We determine the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (orig. proceeding); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding).

A writ of mandamus will issue to correct a clear abuse of discretion committed by a trial court in granting a new trial. *In re Whataburger Rests., LP*, 429 S.W.3d 597, 598 (Tex. 2014) (orig. proceeding) (per curiam); *In re Toyota*, 407 S.W.3d at 756–57; *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding).

### III. NEW TRIALS

Rule 320 of the Texas Rules of Civil Procedure gives the trial court broad discretion to grant a new trial "for good cause, on motion or on the court's own motion." TEX. R. CIV. P. 320. However, that authority is not unfettered. *See* TEX. CONST. art. I, § 15; *In re Bent*, 487 S.W.3d 170, 175 (Tex. 2016) (orig. proceeding); *In re Cambell*, 577 S.W.3d 293, 297 (Tex. App.—Houston [14th Dist.] 2019, orig. proceeding). "[S]uch discretion should not, and does not, permit a trial judge to substitute his or her own views for that of the jury without a valid basis." *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 212 (Tex. 2009) (orig. proceeding); *see In re United Scaffolding*, 377 S.W.3d at 688–89; *In re Pantalion*, 575 S.W.3d 382, 383 (Tex. App.—Beaumont 2019, orig. proceeding) (per curiam).

4

A trial court does not abuse its discretion so long as its stated reason for granting a new trial is: (1) a reason for which a new trial is legally appropriate, such as a well-defined legal standard or a defect that probably resulted in an improper verdict; and (2) specific enough to indicate that the trial court did not simply "parrot a pro forma template," but rather derived the articulated reasons from the particular facts and circumstances of the case at hand. *In re United Scaffolding*, 377 S.W.3d at 688–89. Thus, when a trial court orders a new trial after a case has been tried to a jury, the parties "'are entitled to an understandable, reasonably specific explanation why their expectations are frustrated by a jury verdict being disregarded or set aside, the trial process being nullified, and the case having to be retried.'" *In re Bent*, 487 S.W.3d at 175–76 (quoting *In re Columbia*, 290 S.W.3d at 213); *see In re Wagner*, 560 S.W.3d 309, 318–19 (Tex. App.— Houston [1st Dist.] 2017, org. proceeding). If the trial court's order granting a new trial satisfies these facial requirements, an appellate court may "conduct a merits review of the bases for [the] new trial order" and "grant mandamus relief '[i]f the record does not support the trial court's rationale for ordering a new trial.'" *In re Bent*, 487 S.W.3d at 173 (quoting *In re Toyota*, 407 S.W.3d at 749); *see also In re United Scaffolding*, 377 S.W.3d at 688–89 (providing that a trial court's grant of a new trial is subject to mandamus review). We review the merits of a new-trial order under the abuse-of-discretion standard "familiar and inherent in mandamus proceedings." *In re Bent*, 487 S.W.3d at 177–78; *In re Toyota*, 407 S.W.3d at 758; *see In re Whataburger*, 429 S.W.3d at 59; *see also In re Peterson Constr., Inc.*, No. 13-15-00535-CV, 2016 WL 3548643, at *5 (Tex. App.—Corpus Christi– Edinburg June 17, 2016, orig. proceeding) (mem. op.).

In this case, the trial court determined that the jury's verdict was not supported by factually sufficient evidence. Under traditional factual sufficiency standards, a court

5

determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). In a factual-sufficiency review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). Neither the trial court nor this court may substitute its own judgment for that of the jury, even if the court would reach a different answer on the evidence. *Windrum*, 581 S.W.3d at 781; *Jackson*, 116 S.W.3d at 761; *Maritime Overseas Corp.*, 971 S.W.2d at 407. The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Jackson*, 116 S.W.3d at 761. If an appellate court concludes that the evidence is factually insufficient, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Pool*, 715 S.W.2d at 635.

## IV.    ANALYSIS

The specific issues in this case involve the factual sufficiency of the jury's findings regarding whether any party was negligent in their treatment of Laura and thus, proximately caused her death.

## A.    Applicable Law

The elements of a negligence cause of action consist of the "existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 352 (Tex. 2015). The components of proximate cause are (1) cause-in-fact and (2) foreseeability. *Univ. of Tex. M.D. Anderson*

6

*Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 518 (Tex. 2019); *Ryder Integrated Logistics, Inc. v. Fayette Cty.*, 453 S.W.3d 922, 929 (Tex. 2015). "A defendant's action is the cause in fact of damages if it was a substantial factor in causing the injury and without which the injury would not have occurred." *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018) (internal quotations omitted); *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). Foreseeability exists when "the actor should have reasonably anticipated the dangers that his negligent conduct creates for others." *McKenzie*, 578 S.W.3d at 519. It "does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Id.* (quoting *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992)).

In Question One of the jury charge, respondent asked the jury, "Did the negligence, *if any*, of those named below [Dr. Torres, Strader, Enrique, or Laura] proximately cause the death of Laura Linan?" (emphasis added). The jurors unanimously found that none of the named individuals were negligent. In granting real party's motion for new trial, respondent concluded that the jury's failure to find negligence from any of the four was so against the great weight of the evidence as to be clearly wrong and manifestly unjust "because the evidence and argument at trial required an 'either-or' decision, not a 'none of the above.'" Respondent discussed evidence presented at trial and surmised: "The evidence supports a finding that either Nurse Strader and/or Dr. Torres breached the applicable standard of care proximately causing Mr. Linan's death," and "[c]onversely, the evidence also supported a contrary finding that either Enrique Linan and/or Ms. Linan breached the applicable standard of care proximately causing Ms. Linan's death."

As a preliminary matter, we find that the trial court's amended order meets the threshold requirements established by the Texas Supreme Court for orders granting new

7

trials.[5] *See In re United Scaffolding*, 377 S.W.3d at 688–89. The trial court's order recites that the verdict was against the great weight and preponderance of the evidence or was supported by factually insufficient evidence, which are legally sound reasons to grant a new trial. *See id.*; *see also, e.g.*, *Sanders v. Harder*, 227 S.W.2d 206, 209–10 (Tex. 1950) ("In ordinary civil cases trial courts . . . may set aside jury verdicts and grant new trials when, in their opinion, those findings, though based upon some evidence, are against the great weight and preponderance of the evidence."). Moreover, the trial court's order elaborates, with specific reference to the evidence adduced at trial, how the jury's answers are contrary to the great weight and preponderance of the evidence. *See In re United Scaffolding*, 377 S.W.3d at 688–89; *In re Columbia*, 290 S.W.3d at 212. Accordingly, we must determine whether the trial court's stated reasons for granting a new trial are valid and correct by conducting a careful "merits review" of the record. *See In re Toyota*, 407 S.W.3d at 759 ("Simply articulating understandable, reasonably specific, and legally appropriate reasons is not enough; the reasons must be valid and correct.").

The record, however, does not support respondent's rationale for ordering a new trial. *See id.*; *In re United Servs. Auto Ass'n*, 446 S.W.3d 162, 176–77 (Tex. App.—Houston [1st Dist.] 2014) (providing that "[e]ven if the order satisfied *United Scaffolding*," a new trial was improper because the jury verdict was not against great weight and preponderance of evidence). The jury heard ample evidence, explored *infra*, from which

---

[5] We additionally note that the Texas Supreme Court has explained that "absent mandamus review," the parties "will seemingly have no appellate review" of orders granting new trials. *See In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 209 (Tex. 2009) (orig. proceeding). The supreme court reasoned that even if a party could obtain appellate review of a new trial order after a second trial, it could not obtain reversal of an unfavorable verdict unless it convinced the appellate court that granting the new trial constituted harmful error. *Id.* Moreover, even if an unfavorable verdict were to be reversed and rendered in the party's favor, that party "would have lost the benefit of a final judgment based on the first jury verdict without ever knowing why, and would have endured the time, trouble, and expense of the second trial." *Id.* at 209–10. Thus, relators lack an adequate remedy by appeal.

it could have reasonably concluded that *no* party acted negligently and was the proximate cause of Laura's death. *See Fayette Cty.*, 453 S.W.3d at 929; *Yap v. ANR Freight Sys., Inc.*, 789 S.W.2d 424, 425–26 (Tex. App.—Houston [1st Dist.] 1990, no pet.) ("The question of proximate cause is one of fact particularly within the province of the jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances.").

## B.  Evidence

The trial of the case included numerous exhibits and testimony from six witnesses. The pertinent evidence adduced at trial is summarized as follows.

### 1.  Dr. Susan Hunter

On February 2, 2015, Laura saw Susan Hunter, M.D., an obstetrics and gynecology specialist, complaining of heavy bleeding and menstrual cramps. Dr. Hunter testified she recommended Laura undergo a "complete workup," including a physical examination, Pap smear, ultrasound, and blood work to "look[] for infections." The ultrasound revealed "a large mass on the uterus" measuring twelve centimeters. Dr. Hunter testified she instructed Laura to return in two weeks, but Laura did not, and attempts to reach her were unsuccessful until June.

On June 9, 2015, Laura returned to Dr. Hunter's office, and Laura's blood work indicated she was severely anemic. Dr. Hunter stated she prescribed Laura an oral contraceptive to help address her "life-threatening anemia". Dr. Hunter testified she also recommended that Laura either have the mass removed (a myomectomy) or undergo a full hysterectomy. Dr. Hunter explained that the former option would give her "the opportunity to evaluate the mass and [Laura] a chance to maintain her fertility." Dr. Hunter was concerned that the mass was cancerous and "also believed that [removal of the

9

mass] would address the anemia as well." The mass was never removed. On August 2, 2015, Dr. Hunter testified her office received a phone call from Enrique canceling all of Laura's future appointments due to "insurance issues."

Dr. Hunter opined that "it is more likely than not" that the removal of that mass earlier would have prevented Laura's death.

> She had, we know for certain, a large mass. We know that mass could possibly have compressed her pelvic vessels. That could have either caused a blood clot in the pelvic vessels or it could have caused a simple slowing of the blood, especially while she was laying down asleep. That led to a blood clot that we know formed in her pulmonary arteries and that blood clot killed her or a blood clot which was formed in the pelvic vessels traveled up and joined the blood clot that we know was there and killed her.

Dr. Hunter further acknowledged that women over thirty-five taking birth control are at a greater risk for blood clotting, and hypothetically, if such a patient complained of shortness of breath and chest pain, it may indicate a pulmonary embolism.

### 2. Nurse Goldie Strader

On October 17, 2015, Enrique transported Laura to San Benito Medical Associates. Strader testified that Laura was complaining of "chest pressure and shortness of breath," Laura described her symptoms as "mild," and stated that the problem had only been present for one day. Laura also reportedly told Strader that she had been to the emergency room (ER) to get an EKG and lab work done, and "they did not find anything." Strader testified Laura did not specify how recently she had been at the ER.

Strader conducted a physical exam and notated no abnormalities to any of Laura's lower extremities. "Her strength was normal, tone was normal, and there was no atrophy, no abnormal movements noted. I also looked at her skin. . . . I noted there was no rashes, no lesions, no areas of discoloration." Strader further noted that Laura's breathing appeared "unlabored," and there were no signs of "[a]usculation of [her] lungs." "Because

10

her vital signs were normal," Strader said she instructed Laura to "go to the ER if her symptoms persisted" and to otherwise "return to the clinic on Monday for [an] EKG" and lab work. Strader stated Laura did not report any past medical or surgical history, so Strader was unaware of Laura's sizable uterine mass. Strader confirmed that while she listed "pulmonary embolism" on her "differential list" for Laura's diagnosis,[6] it was "lowest on the list", and the list was extensive and included more common conditions, such as, asthma, panic attack, gastritis, pneumonia, and acute bronchitis.

### 3. Dr. Frank Torres

One week later, on October 24, 2015, the Linans returned to the clinic and were seen by Dr. Torres. Dr. Torres testified he prescribed Keflex to treat bronchitis. Dr. Torres, like Strader, noted Laura's vital signs appeared normal and maintained that Laura did not present symptoms most common with pulmonary embolism.

> Well, most people who present with pulmonary embolism are not doing good. They're sick. Their blood pressure is going to be low. Their pulse is raised. We—the greatest—the greatest indicator—this is the way I was taught in medical school. What is the one EKG finding you can find in a pulmonary embolism and that's tachycardia, increased heart rate. It's one of the Wells for a criteria. It's a criteria that we use for pulmonary embolism is heart rate greater than a hundred. Her heart rate was less than a hundred.

Dr. Torres denied reading the record from Laura's previous visit on October 17th. Further, unlike Strader, Dr. Torres's visitation notes were brief and written over a week after the visit.

---

[6] "A differential diagnosis looks at the possible disorders that could be causing your symptoms. It often involves several tests. These tests can rule out conditions and/or determine if you need more testing." *Differential Diagnosis*, MEDLINE PLUS, https://medlineplus.gov/lab-tests/differential-diagnosis/ (last visited Sept. 13, 2020).

### 4. Enrique Linan

Enrique and Laura married in 2014. Enrique stated that although he was sixty-two years old at the time and "wasn't going to have any more children," "[Laura] wanted children," so they "visited Dr. Hunter to maybe explore the possibilities of having children" in early 2015.

Enrique denied that Dr. Hunter ever relayed an urgency regarding removal of the uterine mass found, and he sought to clarify his cancellation of all further appointments. Enrique stated his previous insurance would no longer cover Dr. Hunter. "I called to give the new insurance so that the new insurance can take over. The insurance that I bought for her would be—or will accept Dr. Hunter as her doctor." Enrique, however, confirmed Laura never returned to see Dr. Hunter.

In mid-October 2015, Enrique testified that Laura started to experience "symptoms of gasping for air." Enrique said he "kind of let it go for day or so, but then one morning she continued to complain so [he] decided to go have it checked out."

> [I remember] [e]verything. I remember—I remember going in. I can describe the place in its entirety. We made—we went there[,] and we scheduled an appointment. We went inside the building. We took a left. Then we took a right. We went on the third room to the left. A lady came in and she asked the reason why we were there. We basically told her my wife is experiencing chest pains. She's tends to gasp for air. We want to know what's going wrong. I remember the young lady—I'm assuming that assistant or nurse.
>
> I was expecting a doctor, not that I have anything about nurse practitioner, but I was expecting a doctor. That's when—that's when Ms. Strader came in. She again asked the reason for my visit and we again told—I told her— I told her that my wife was gasping for air. That she was having difficulty breathing. That she was constantly touching her chest and that we were both very concerned. We didn't know what it was. So she went ahead and took the vital signs and looked into the throat, looked at the nose, and put the stethoscope in the chest and in the back. Within seconds, I mean, that's it. I mean, there was nothing else done.

Enrique testified that Strader told him, "'Your wife is fine. There's nothing wrong with her. Look at her.'" He said Strader then turned to his wife to say, "'You're so pretty[.] . . . I wish I was you.'" Enrique said he was never told by Strader to take Laura to the ER if symptoms persisted or to return on Monday to get additional testing done. "No. What she suggested was that—that's something that I also found kind of odd is that she mentioned that if [Laura] needed a friend, that there was a Filipino working on Monday also so they could make friends or whatever."

Enrique explained that the couple returned the following Saturday because Laura's chest pain continued, and she had developed a dry cough. According to Enrique, "[Dr. Torres] took the vital signs and looked at her nose and the stethoscope [sic] and within seconds he said, 'I know what it is.' . . . He said, 'She's got an infection.'" Enrique testified that he asked Dr. Torres to take some X-rays or to recommend them to a specialist, but Dr. Torres was dismissive of Enrique's concerns. Laura died nine days later.

On cross-examination, Enrique confirmed that though he knew his wife was suffering from "life-threatening anemia," he did not take his wife[7] back to see Dr. Hunter or any other physician to address the anemia or mass. Enrique also confirmed that he did not disclose Laura's condition, the anemia or mass, during the visit with Strader or Dr. Torres, stating, "It did not cross my mind". When asked why, if he "feared for her life" and "thought the care and treatment" by Strader and Dr. Torres was inadequate, he did not transport Laura to the hospital in the days following the second visit, Enrique responded, "I specifically remember that Dr. Torres emphasized that you must let the medicine work. You must let the medicine work. I was waiting for the medicine to work."

---

[7] Enrique testified Laura did not know how to drive so he transported her to all her appointments.

13

## 5.    Dr. Harvey R. Gross

Harvey R. Gross, M.D., a family physician certified in geriatrics, testified as real party's medical expert. Dr. Gross testified that he reviewed the medical records and depositions of Enrique, Dr. Torres, and Strader. Dr. Gross opined that both Strader and Dr. Torres each breached the respective standard of care of an ordinarily prudent nurse practitioner and physician.

Dr. Gross testified that because Laura, at thirty-nine years old "presented with shortness of breath and some form of chest pain" and "she was taking birth control pills," "that combination immediately would make one think about pulmonary embolus." According to Dr. Gross, "[P]ulmonary emboli do not always present as a critically ill person. Many times they can present with history that's suspicious of a pulmonary embolus without the actual signs of a pulmonary embolus. If you have any clinical suspicion, you have to be immediately—you have to immediately look into it because it can kill you."

Dr. Gross testified that Strader should have "sen[t] her to the ER that evening," and that Dr. Torres had the responsibility to review Laura's chart, "order[] an EKG and some labs," and send her to the ER. Dr. Gross maintained that going to the ER would have saved Laura from her pulmonary embolism because she could have received "a blood test call[ed] the D-dimer" and a CAT scan to establish whether she had a pulmonary embolus or not.

Dr. Gross acknowledged, however, that when considering differential diagnoses, there "are many different causes of shortness of breath," and "compared to the common cold or a flu, a pulmonary embolus is a relatively rare occurrence."

14

## 6.    Dr. James Bernick

James Bernick, M.D., a physician board certified in family and geriatric medicine, testified as the relators' medical expert. Dr. Bernick opined, "[Stradler's] examination [of Laura], her history taking, her view of symptoms, her physical examination, and then also her assessment and plan, [I] think, were solid and met the standard of care both [a] nurse practitioner and a family physician."

Because Laura presented with a one-day history of self-described "mild" symptoms and was not in visible distress, the physical examine yielded unremarkable findings, "her breathing was unlabored," and "[s]he had a normal heart rate, normal respiratory rate, and her blood pressure was in a normal range," Dr. Bernick testified that a pulmonary embolism diagnosis "would be very low on [his differential diagnosis] list." "It would not raise enough suspicion in me that I would want to do any additional studies such as sending the patient to the emergency room for a D-dimer or blood test or an ultrasound of the legs [to see if a clot was present]," testified Dr. Bernick.

Dr. Bernick surmised similarly regarding Dr. Torres's examination of Laura.

> The vital signs were completed that day and also Dr. Torres wrote an assessment and plan and prescribed medication. That's not unusual if you're seeing a number of patients not to complete the chart immediately but to put in some cues. He had a cue that the diagnosis was bronchitis and was being treated with antibiotics and the vital signs were normal.

## 7.    Summary

Strader and Drs. Hunter, Strader, Dr. Torres, Dr. Gross, and Dr. Bernick, i.e., every medical professional at trial, testified that a finding of pulmonary embolism is rare and that Laura's symptoms also coincided with more common ailments, such as the common cold. We additionally observe that Laura nor Enrique informed Strader or Dr. Torres about Laura's preexisting mass or bleeding condition. With respect to Strader, real party's

15

expert testified that her negligence stemmed from her failure to immediately refer Laura to the ER for testing given Laura's symptom presentation. Dr. Bernick, contrariwise, testified that because Laura's symptoms were mild and she presented with no abnormalities, Strader—in conducting a thorough physical examination, taking Laura's vital signs, requesting that Laura return in two days for additional testing, and communicating that Laura should go to the ER should problems persist or escalate in the interim[8]—acted with ordinary prudence.

Similarly, Dr. Bernick testified that although by the time Dr. Torres evaluated Laura, she had been experiencing chest pain for one week and had recently developed a cough, because her vital signs and physical examination continued to yield no abnormal results, Dr. Torres acted with ordinary prudence in his diagnosis and administration of antibiotics. It was within the jury's providence to credit Dr. Bernick's testimony over Dr. Gross regarding the challenged administration of medical care, and likewise, credit Strader and Dr. Torres's recollection of their examination of Laura over Enrique's. *See Jackson*, 116 S.W.3d at 761 (providing that the fact finder is sole judge of credibility of witnesses and weight given their testimony); *In re Wagner*, 560 S.W.3d at 323. Moreover, the aforementioned testimony is *some* evidence that Strader and Dr. Torres acted with ordinary prudence and, consequently, constitutes sufficient evidence to support the jury's finding that they were not negligent. *See Pearson v. DeBoer, Inc.,* 99 S.W.3d 273, 276 (Tex. App—Corpus Christi–Edinburg 2003, no pet.) (providing that whether the plaintiff succeeds in proving negligence by a preponderance of the evidence is within the jury's province to determine).

---

[8] Dr. Gross accepted these actions as fact in his evaluation of Strader's treatment of Laura though Enrique refutes that Strader did anything more than take Laura's vital signs.

With respect to Enrique, although relators argue he should have taken Laura to the hospital when her symptoms worsened, particularly given his dissatisfaction with the medical care Laura received, Enrique testified that he trusted Dr. Torres enough to abide by his treatment plan and thus, chose to wait until Laura completed her ten days of antibiotics.

The evidence supporting the jury's finding that no party was negligent is not so weak or against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See In re United Servs. Auto Ass'n*, 446 S.W.3d at 173–74. Further, the evidence is factually sufficient to support the adverse finding if the evidence is such that reasonable minds could differ on the meaning of the evidence or the inferences and conclusions to be drawn therefrom. *See In re Toyota*, 407 S.W.3d at 759–60 ("The trouble is that the record squarely conflicts with the trial judge's expressed reasons for granting new trial. Simply articulating understandable, reasonably specific, and legally appropriate reasons is not enough; the reasons must be valid and correct."); *In re Baker*, 420 S.W.3d 397, 404 (Tex. App.—Texarkana 2014, no pet.). Accordingly, we hold that respondent abused his discretion in ordering a new trial on the ground that the evidence is factually insufficient to support the jury's finding. *See Toyota,* 407 S.W.3d at 749; *In re Baker*, 420 S.W.3d at 404 ("[T]he grant of the new trial improperly intruded on the jury's province."). We grant mandamus relief. *See Toyota,* 407 S.W.3d at 749 ("If the record does not support the trial court's rationale for ordering a new trial, the appellate court may grant mandamus relief.").

## V. CONCLUSION

The Court, having examined and fully considered the petition for writ of mandamus, the response, the reply, and the applicable law, is of the opinion that the relators have

met their burden to obtain relief. We conditionally grant the petition for writ of mandamus and direct the trial court to vacate its new trial order and conduct further proceedings consistent with this opinion. The writ will issue only if the trial court fails to comply.

GREGORY T. PERKES
Justice

Delivered and filed the 17th
day of September, 2020.

18