# Supreme Court of Texas

No. 21-0135

In re Rudolph Automotive, LLC d/b/a Rudolph Mazda and
Rudolph Chevrolet, LLC,

*Relators*

On Petition for Writ of Mandamus

**Argued December 1, 2022**

JUSTICE YOUNG delivered the opinion of the Court.

After the jury returned its verdict in the underlying negligence and premises-liability suit, the district court granted a motion for new trial. This mandamus action challenges that order. When a trial court perceives a problem to be so serious that only the strong medicine of a new trial can cure it, the court may order a new trial if it provides an adequate explanation that the appellate courts can review. In this case, the district court gave four reasons. We conclude that, taken individually or collectively, those reasons do not justify setting aside the results of the three-week trial. The record does not show that the jury was impaired in fulfilling its constitutional function or that any error in the conduct of the trial warrants retrying the case rather than proceeding in the

ordinary course with the remaining post-trial stages of litigation. We therefore conditionally grant mandamus relief and direct the district court to withdraw its new-trial order.

## I

As 2013 approached its close, Rudolph Mazda's sales team was working eleven-hour shifts (or longer, if closing a sale required it), six days a week, in pursuit of strong year-end results. Irma Villegas and Christian Ruiz, two of the sales employees, finally completed their work and clocked out shortly after 8:00 p.m. on December 27. Their sales manager, Marcelo Flores, sought to encourage morale by sending Ruiz to buy beer, at Flores's expense, and bring it back for the remaining employees to enjoy together after customers had departed. Both Ruiz and Villegas, among others, consumed beer on Rudolph's premises. At the conclusion of their short end-of-day celebration, Flores sent Villegas and Ruiz home.

The festive atmosphere, however, ended in tragedy. Villegas initially walked toward her car but changed course and walked over to a different area of the dealership. At the same time, Ruiz got into his truck and headed for the exit. But in doing so, he accidentally struck Villegas in the parking lot. Villegas sustained serious physical harm, including a traumatic brain injury. The effects were permanent. Villegas was paralyzed on one side and left with a severe facial deformity. She was confined to a nursing home for seven years before passing away in 2020 at the age of 64.

2

Real party in interest Andrea Juarez, Villegas's daughter,[1] sued Rudolph (and related entities) and several of Rudolph's employees. Juarez's claims included negligence, failure to train, and premises liability. The case proceeded to a jury trial, which lasted three weeks.

Because of the nature of the case, the district court granted a motion in limine that prohibited references to Villegas's drinking habits aside from the day of the accident.[2] Near the end of the trial, Rudolph called Dr. Gary Wimbish, a toxicologist, as an expert witness—the last one to testify at trial. During cross-examination, Wimbish responded to a question from plaintiffs' counsel regarding Rudolph's allowance of alcohol on its premises and the source of the alcohol on the day of the tragedy. Counsel asked Wimbish if "the information that [he had] includes that the alcohol was allowed by Rudolph's head person in charge on that night[.]" Wimbish responded: "My information is a bit different from that." Counsel then asked, "What information do you have that's different from that?" Wimbish replied that "in the information that I have received, she brings alcohol with her to work, and . . . had been drinking out of her cup on her own supply of alcohol that day." He admitted that he "d[id]n't remember the exact person" who told him that. At that point, counsel asked to approach the bench.

The district judge was understandably frustrated by what he

---

[1] Juarez sued individually and on behalf of her mother.

[2] The order in limine, for example, barred "[a]ny testimony, evidence, argument or suggestion as to Irma Vanessa Villegas'[s] drinking alcohol on any occasion other than the date of this incident, nor any conduct or behavior when drinking alcohol." The court also barred evidence that Villegas consumed alcohol other than beer on that date.

3

perceived as a serious threat to the integrity of the trial just as it was coming to an end. His order in limine had sought to eliminate prejudicial and unreliable hearsay about the sensitive topic of Villegas's drinking habits. The judge considered granting a mistrial. But after substantial discussion with counsel, he ultimately made what he described as a "tough decision" and instead issued an instruction to the jury. That instruction castigated Wimbish, declaring that his testimony "is not credible, is unreliable, and not evidence in this case." The judge continued: "You are instructed to disregard the witness's testimony" as to the topics at issue. He polled the jurors, who each individually confirmed that they understood and would follow the instruction. The trial resumed and the court submitted the case to the jury.

The jury ultimately returned a substantial verdict that awarded plaintiffs over $4 million in damages. Several features of the verdict are relevant to our resolution of the case. First, with respect to the event leading to the injury, the jury found that Flores (the manager who paid for the beer and allowed the employees to drink it at the end of the day) was acting in the scope of his employment with Rudolph, but Villegas and Ruiz were not. Second, the jury found that the negligence of Flores, Ruiz, and Villegas—but not Rudolph—was "a proximate cause of the occurrence in question." Indeed, it twice answered "no" to Rudolph's negligence—first generally and then specifically as to Rudolph's status "as an owner or occupier of the premises."[3] Third, the jury was asked to "find the percentage of responsibility attributable" to "each person you

---

[3] The jury also answered "no" to this question: "Was alcohol consumed at a function, if any, of Rudolph Mazda on the occasion in question?" (Capitalization deleted.)

4

found caused or contributed to cause the occurrence," and it allocated that responsibility as follows: Rudolph (10%); Flores (25%); Ruiz (35%); Villegas (30%). That is, despite twice having failed to find Rudolph negligent, it nevertheless assigned Rudolph 10% responsibility. Fourth, the jury awarded the following damages for Villegas:

- $630,000 for past medical expenses;
- $2,500,000 for future medical expenses;
- $25,000 for past physical pain and suffering;
- $25,000 for future pain and suffering;
- $25,000 for past physical impairment;
- $25,000 for future physical impairment;
- $0 for past disfigurement;
- $200,000 for future disfigurement;
- $150,000 for past lost earning capacity;
- $240,000 for future lost earning capacity;
- $25,000 for past mental anguish; and
- $25,000 for future mental anguish.

Finally, the jury awarded the following amounts to Juarez for her own losses attributable to Villegas's injuries:

- $0 for past household services and personal care provided by Juarez for Villegas's benefit;
- $150,000 for future household services and personal care to be provided by Juarez for Villegas's benefit;
- $0 for past lost parental consortium; and
- $0 for future lost parental consortium.

The court discharged the jury without objection from either party. A few weeks later, Rudolph filed a motion to disregard the jury's findings as to the apportioned-responsibility question. Several weeks after that,

5

Juarez filed motions for judgment notwithstanding the verdict and, on grounds of mistrial, for a new trial.

The district court granted Juarez's motion and signed an order, drafted by Juarez's counsel, which identified four reasons that it thought "[c]ollectively or individually . . . warrant a new trial":

1. "[T]he jury determination of comparative responsibility of Rudolph Mazda . . . is error that cannot be reconciled nor disregarded, and prevents the 100% total comparative responsibility required by law. . . ."

2. "[T]he determination of Zero (-0-) Damages for past disfigurement of Irma Vanessa Villegas . . . as well as Zero (-0-) Damages for daughter Andrea Juarez for Past household services . . . and for Past and future loss of parental consortium . . . completely ignore the undisputed facts, and the other damages" for Villegas's past and future pain and suffering and past and future physical impairment "fix an amount neither authorized nor supported by the evidence and is contrary to the great weight of the evidence. . . ."

3. This Court's "decision in [*Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125 (Tex. 2018)] rendered . . . the day of this Jury Verdict, was important law that affected [the court's rulings and the parties' positions]. . . . Based on the Painter opinion . . . it appears to this Court that it needs to reconsider whether [Villegas and Ruiz] were injured in the course of employment as a matter of law . . . ."

4. "[D]efense expert Gary Wimbish intentionally injected unreliable double hearsay . . . in an attempt to inject an improper inference before the jury." Despite the court's best attempts to eliminate the harm, "it is obvious to this Court that the harm done could not be eliminated or removed. The Court finds this improper evidence and behavior to impugn the character of Irma Vanessa Villegas [caused] the rendition of an incorrect verdict by the Jury as the evidence showed Irma Vanessa Villegas was a hardworking dependable and responsible mother, grandmother and sister; there was no negative evidence or detracting evidence other than expert

6

Wimbish's testimony."[4]

Rudolph petitioned the court of appeals for a writ of mandamus. In a divided ruling, that court denied relief, holding that the district court had not abused its discretion in granting a new trial. 616 S.W.3d 171 (Tex. App.—El Paso 2020, orig. proceeding).

Rudolph then filed a mandamus petition in this Court. We set the case for oral argument and now conditionally grant the writ.[5] We conclude that, individually or collectively, none of the articulated errors presents a proper basis for a new trial. Granting a new trial for those reasons, therefore, constitutes a clear abuse of discretion.

## II

The first of our cases to systematically analyze both why and how Texas courts should review new-trial orders was *In re Columbia Medical Center of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204 (Tex. 2009). From its very first sentence, *Columbia* addressed why such an endeavor is necessary: because "[t]he Texas Constitution provides that the right of trial by jury 'shall remain inviolate.'" *Id.* at 206 (quoting Tex. Const. art. I, § 15). Each of our cases following *Columbia* has echoed this fundamental constitutional premise.[6]

---

[4] The district court's order listed the *Painter* issue fourth and the expert-witness issue third. We invert the order solely to facilitate our analysis below.

[5] This Court has recognized that there is no adequate remedy by appeal when a district court issues an erroneous new-trial order. *See In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 209–10 (Tex. 2009). Accordingly, the only question here is whether the challenged new-trial order was an abuse of discretion. *See In re Bent*, 487 S.W.3d 170, 177–78 (Tex. 2016).

[6] *See, e.g.*, *In re Davenport*, 522 S.W.3d 452, 455 (Tex. 2017); *Bent*, 487

*Columbia* also addressed how trial and appellate courts work together in the context of reviewing new-trial orders. Before *Columbia*, there was little formal role for *either* level of the judiciary. Trial courts could order a new trial without any realistic chance of review. No explanation was required beyond stating that a new trial was "in the interest of justice and fairness." *See, e.g.*, *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985). Appellate courts almost never assessed new-trial orders and generally would not see a case until it came up after a second trial, if it ever came up at all.

*Columbia*'s core holding seemed revolutionary but was actually modest: simply requiring a meaningful articulation of the reasons for a new-trial order. We rejected as quite immodest the idea that a court could wipe away the work of a duly empaneled jury by merely intoning with formulaic insouciance that "the interests of justice and fairness" so demand. *Columbia*, 290 S.W.3d at 213. We held that "such a vague explanation in setting aside a jury verdict" amounted to no real explanation at all. *Id.*

Accordingly, *Columbia* stands initially for the principle that it is an abuse of discretion to grant a new trial if the order is not accompanied by meaningful reasons. Such an order, we held, must clearly identify "an understandable, reasonably specific explanation" for why a new trial is warranted. *Id.*

But *Columbia* did not require trial courts to provide reasons as a

---

S.W.3d at 172–73, 175–76; *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 756, 759 (Tex. 2013); *id.* at 762 (Lehrmann, J., concurring); *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688 (Tex. 2012); *id.* at 692 (Wainwright, J., concurring in judgment).

mere formality. The requirement was not a formality at all, in fact. To the contrary, an explanation is the essential prerequisite for *verifying* that a new-trial order does not contravene the constitutional principle that judges may not "substitute [their] own views for that of the jury without a valid basis." *Id.* at 212. No level of the judiciary has the authority to repudiate a determination, predicated on the presence of probative evidence, made by a properly constituted and instructed jury in response to a properly submitted question. *See, e.g.*, *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Lloyd v. Brinck*, 35 Tex. 1, 1 (1872).

Ordering a new trial, therefore, reflects either (1) a recognition that something has prevented the jury from discharging its role, thus requiring a new jury to do so, which *protects* the right to a jury trial; or (2) a constitutionally intolerable substitution of judicial will for that of the jury, which *undermines* the right to a jury trial. To maintain confidence that the judiciary is confining itself to the first option, the parties, the public, and indeed the members of the first jury are entitled to a clear and "plausible" explanation. *Columbia*, 290 S.W.3d at 214. Requiring that judges reduce their rationales to writing also gives judges a further chance to confirm that truly proper and sufficiently weighty reasons underlie the new-trial order—a confirmation that is particularly important when identifying the reason seems especially difficult. *Id.* at 212. *Columbia* therefore requires not just that an explanation be made but that it reflect "a valid basis" to disregard a verdict. *Id.*

Our respect for the integrity of the jury system, in short, imposes demands on every level of the judiciary. True, *Columbia* obligates trial

9

courts to provide reasons that were not previously required. But *Columbia* likewise entails a duty on the appellate courts that they did not previously bear: the responsibility to assess a new-trial order's stated reasons. Our cases following *Columbia* illustrate these principles.

For example, in our first case following *Columbia*, we took the next step and clarified when a stated reason is adequate. In *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 687–88 (Tex. 2012), we confirmed that the "reasons" provided in a trial court's new-trial order do not have to duplicate the rigid requirements that we imposed on appellate courts in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986), in the context of factual-sufficiency reviews. When a judgment is based on a verdict, appellate courts cannot reverse for factual insufficiency without laboriously detailing all the relevant record evidence, both for and against the verdict. *Id.* Such an obligation sometimes would be impossible for trial courts, which may not have a formal record when they must decide whether to grant a new trial. *United Scaffolding*, 377 S.W.3d at 688.

At the same time, however, we made clear that, to avoid constituting an abuse of discretion, a new-trial order's explanation must at minimum contain reasons that the record will support. "The order must," for example, "explain how *the evidence (or lack of evidence)* undermines the jury's findings." *Id.* at 689 (emphasis added). We held that a reason would be sufficient only if it is one "for which a new trial is legally appropriate" *and* "is specific enough to indicate that the trial court . . . derived the articulated reasons from *the particular facts and circumstances* of the case at hand." *Id.* at 688–89 (emphasis added).

A legally invalid rationale cannot be "legally appropriate," of

10

course. And a reason that is untethered from the record would, by definition, not be one "derived . . . from the particular facts and circumstances" that a given case presents. *Id*. at 689. Likewise, a meritless reason—one that could not survive legal scrutiny—could not be "valid," "legally appropriate," or founded on a given case's "facts and circumstances." Thus, as we held in our third case examining new-trial orders, "the correctness or validity of the orders' articulated reasons" is subject to appellate "evaluat[ion]." *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 758 (Tex. 2013). "Appellate courts must be able to conduct merits-based review of new trial orders. If, despite conformity with the procedural requirements of our precedent, a trial court's articulated reasons are not *supported by the underlying record*, the new trial order cannot stand." *Id.* (emphasis added).

We have applied these principles in two further cases. In *In re Bent*, 487 S.W.3d 170 (Tex. 2016), the trial court's explanations were either insufficient on their face or, despite being facially sufficient, could not survive merits review. We reiterated several times that, when conducting a merits review of a facially sufficient reason for a new trial, the stated reason must have record support. *Id.* at 176–77. To be clear, we reaffirmed in *Bent* (and do so again today) that "a *Pool*-like standard of review" is not required. *Id.* at 176. But we immediately added that, "[i]n urging quality over quantity . . . we did not relieve any trial court of its responsibility *to point to evidence* that played a pivotal role in its decision." *Id.* (emphasis added); *see also id.* at 177, 180, 183, 184 (confirming the requirement of record support for stated new-trial reasons).

*Bent* provided an illustration of how the kinds of inadequacies

that may require an appellate court to disregard a new-trial order can be distinct yet closely related. A reason might be theoretically plausible, but if it is devoid of reference to the evidence, it will be facially insufficient; orders that provide no basis for the parties and appellate courts to confirm that the court's determination was the result of careful assessment of the actual evidence in the case are conclusory. If the failure to invoke sufficient record support is because there *is* none, or because (as in *Toyota*) the evidence in fact rebuts the stated reason, the deficiency is not merely facially insufficient but also relates to the merits. Such a merits-based deficiency suggests that the proffered reason is simply an error. And when a reason for a new trial appears to conflate a *legal* problem with an *evidentiary* one, the appellate court will likewise deem that reason inadequate because it fails on the merits. In *Bent*, for example, one of the new-trial order's reasons was inadequate because "the trial court never pinpoints the events or dates it believed triggered USAA's prompt-payment obligation." *Id.* at 179. The court's explanation, we also said, "suggests a muddled legal- and factual-sufficiency evaluation of the evidence." *Id.*

While the grounds for deeming a reason to be inadequate are therefore distinct, they can also overlap. The underlying concern, after all, is always the same: whether the new-trial order is predicated on clear and valid grounds.

Finally, in *In re Davenport*, we concluded as a matter of law that the trial court's rationale could not support a new trial because the record reflected that the underlying fee agreement unambiguously precluded recovery of the business interests claimed by the attorneys who had sued

their former clients. 522 S.W.3d 452, 457–59 (Tex. 2017). Accordingly, we directed the trial court not only to withdraw its new-trial order but also to render judgment for the relator, *id.* at 459, which, happily, was the same result the jury had reached, *see id.* at 461 (Boyd, J., concurring in judgment) (disagreeing that the Court should have resolved the question as a matter of law but agreeing that the outcome coincided with the jury verdict).

None of these five cases casts doubt on the authority of this State's trial courts to order a new trial. To the contrary, when a verdict *is* irredeemably tainted, a court's willingness to subject itself to the burdens of a retrial is commendable. Each of our cases, from *Columbia* onward, has emphasized our recognition of and respect for trial courts' broad discretion.[7] As we said in *United Scaffolding*, "trial judges actually attend the trial and are best suited to evaluate its deficiencies." 377 S.W.3d at 687. But as we also said, there is no true conflict: "[W]e must *both* afford jury verdicts appropriate regard *and* respect trial courts' significant discretion in these matters." *Id.* (emphases added).

The following, therefore, summarizes our line of new-trial-order cases. First, trial courts retain considerable authority to grant new trials. Indeed, their special vantage point makes it essential that they be willing to do so when they observe problems that threaten the integrity of the process and, therefore, the reliability of the verdict. Second, however, disregarding a jury's verdict is an unusually serious act that imperils a constitutional value of immense importance—the authority of a jury.

---

[7] *See, e.g., Columbia*, 290 S.W.3d at 210, 212; *United Scaffolding*, 377 S.W.3d at 687; *Toyota*, 407 S.W.3d at 758; *Bent*, 487 S.W.3d at 175; *Davenport*, 522 S.W.3d at 456.

13

Such a step may be taken only when clearly supported by sound reasons. Third, while it is unlikely that a judge would ever order a new trial for a constitutionally suspect purpose, an explanation is necessary to ensure that only *valid* reasons supported by the record underlie the new-trial order and that all parties and the public understand what those reasons are. Finally, the appellate courts' mandamus review is not limited to assessing the *facial* validity of the new-trial order but necessarily extends to the underlying merits—including the conclusion that the reason provided is a mistake of law or unsupported by the record. Because trial courts have no authority to grant a new trial without a valid reason, if the order is predicated on legal error or lacks record support, mandamus should issue to require the withdrawal of the new-trial order.

These principles work together, with all levels of the judiciary performing distinct tasks in service of a common goal: ensuring that our civil-justice system honors the jury-trial right by requiring new trials when, and only when, the law authorizes that result.

### III

After conducting the evaluation that our precedents prescribe, we conclude that the district court abused its discretion in granting a new trial.

### A

The district court's first three stated reasons—the apportionment of responsibility to Rudolph in the verdict, the jury's findings on noneconomic damages, and this Court's decision in *Painter*—involve purely legal analysis. "A district court by definition abuses its discretion

14

when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). More to the point, an action that a court takes because of that court's error of law is inherently an abuse of discretion. *See In re Abbott*, 645 S.W.3d 276, 282–83 (Tex. 2022). Accordingly, we must disregard a new-trial order if we determine, as we do here, that its reasons are wrong as a matter of law.

**1**

The first reason, reproduced here, relies on the verdict's apportioning Rudolph a percentage of responsibility after failing to find the dealership negligent:

> The Court finds that the jury determination of comparative responsibility of Rudolph Mazda in Question 4 is error that cannot be reconciled nor disregarded, and prevents the 100% total comparative responsibility required by law. Without 100%, the comparative responsibility finding is fundamentally defective.

The inconsistency in the verdict, however, does not constitute a valid ground for a new trial.

The proper time for a party to raise an allegedly insoluble conflict in the verdict's treatment of comparative responsibility is before the court discharges the jury.[8] This timeliness standard is no mere technicality. A timely objection is what allows a "court [to] correct the error by providing additional instructions and retiring the jury for further deliberations." *Los Compadres Pescadores L.L.C. v. Valdez*, 622 S.W.3d 771, 787 (Tex. 2021). A party who waits until the jury is discharged has forfeited the

---

[8] Both parties argue that there is inconsistency in the jury's two answers; it is in neither side's interest to argue otherwise. For purposes of our decision, we may assume without deciding that they are correct.

15

opportunity to obtain greater clarity from the jury.[9]  Having had the chance to eliminate the irreconcilability, such a party generally cannot later invoke the conflict in the jury's answers to win a new trial on appeal; that party cannot "complain that the conflicting answers undermine the judgment based on the jury's verdict." *Id.* at 787–88.  In other words, appellate courts ordinarily may not force a trial court to hold a new trial on the ground of an irreconcilable verdict when a timely identification of the alleged irreconcilability could have quickly resolved the matter and eliminated the need for a complete redo.

But here, of course, the trial court willingly accepted the burden of a new trial despite plaintiffs' failure to timely identify the alleged irreconcilability.  The lack of a timely objection to a jury's discharge may deprive a party of an appellate point, but it does not deprive *the trial court* of the authority to grant a new trial if the court concludes that the irreconcilability of a verdict prevents the rendition of a reliable judgment.  Indeed, a trial court could come to that conclusion on its own, regardless of what the parties think.  If a trial court grants a new trial on the ground of irreconcilability, the appellate courts will be able to review that order under the standards in this Court's precedents.

It is on this understanding that we review the new-trial order here.  Plaintiffs' failure to timely invoke irreconcilability, in other words,

---

[9] A court is, of course, not always obligated to resubmit the case to the jury whenever a party alleges the irreconcilability of the jury's answers before the jury's discharge.  If the court finds no inconsistency, or that any inconsistency is reconcilable as a matter of law, the court need not impose further deliberations on the jury.  The point is that the timely objection is essential to alert the court to its duty to determine whether such further deliberations are necessary or helpful.

is not the concern; we instead focus on whether deeming the verdict irreconcilable constituted legal error. We find that it was error, and thus incapable of supporting a new-trial order, because the law already provides for harmonizing the verdict.

A legally sound reconciliation is the duty of the *court*, which must "reconcile . . . jury findings if at all possible." *Huber v. Ryan*, 627 S.W.2d 145, 145 (Tex. 1981). Although a party must object to discharging the jury to preserve its right to demand a new trial on this ground *on appeal*, no such objection is required for a party to insist that, when it renders a judgment, the court perform the legal duty of reconciling a verdict.

Reconciliation of the verdict is not challenging in this context. The jury's failure to find Rudolph negligent is paramount because it allows a simple arithmetical reallocation of the percentages of fault among the remaining parties who *were* found to be at fault. "Issues establishing or negating liability control over the issue which apportions, rather than establishes, negligence." *Beltran v. Brookshire Grocery Co.*, 358 S.W.3d 263, 269 (Tex. App.—Dallas 2011, pet. denied).[10] The allocation to Rudolph is therefore immaterial and can be disregarded. *See, e.g.*, *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) ("A trial court may disregard a jury finding only if . . . the issue is immaterial. A question is immaterial when it . . . was properly submitted but has been rendered immaterial by other findings." (citation omitted)).

The parties remain free in post-trial proceedings to contest the

---

[10] This Court's citation of cases from other courts is typically for purposes of illustration without implying approval or disapproval of the cited case (or cases that it cites) absent a statement to the contrary. Here, we agree with the cited legal proposition but express no further view of *Beltran.*

17

effect of this legal rule on this case or even to dispute whether some other rule requires harmonizing the verdict in a different way. We do not purport to resolve the merits; we hold only that the question is one of law for the court and not for a new jury. If either party remains dissatisfied with how the court reconciles the verdict and reduces it to judgment, that party may also pursue an appeal. The one thing that is not necessary, required, or permissible is a new trial.

**2**

The second reason, reproduced here, is also not a valid ground for a new trial:

> As an additional and independent basis for new trial, the Court finds that the determination of Zero (-0-) Damages for past disfigurement of Irma Vanessa Villegas . . . as well as Zero (-0-) Damages for daughter Andrea Juarez for Past household services . . . and for Past and future loss of parental consortium . . . completely ignore the undisputed facts, and the other damages [for Villegas's past and future pain and suffering and past and future physical impairment] fix an amount neither authorized nor supported by the evidence and is contrary to the great weight of the evidence. The undisputed evidence proved that Irma Vanessa Villegas suffered permanent irreversible traumatic brain injury and was paralyzed on one side of her body, with controverted evidence of constant daily pain, impairment in virtually every movement confined to a bed and wheelchair needing round the clock assistance, and permanent damage to her mental faculties even to the event of being unable at times to know her daughter, her grandchildren and her sisters.

We begin our review with the noneconomic damages awarded to Villegas. The charge asked the jury to assess both past and future damages for four categories: physical impairment, physical pain and

18

suffering, disfigurement, and mental anguish. The jury not only awarded damages in every category but, with one exception, awarded both past and future damages in each. The exception was disfigurement, in which the jury awarded only future damages. *See supra* Part I.

Two aspects of the instructions to the jury are significant to our understanding of the verdict and of the new-trial order purporting to overturn it on this ground. First, aside from an instruction defining "mental anguish" as requiring a heightened showing in accord with our precedents, *see, e.g.*, *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444–45 (Tex. 1995),[11] the instructions included no definition for any of the various forms of Villegas's noneconomic damages.

Second, and relatedly, the instructions did not say or suggest that there was no overlap among the undefined categories of noneconomic damages. As we have held, it is commonplace (and common sense) that many forms of noneconomic damages can overlap with each other. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 770, 773–74 (Tex. 2003). Consistent with that guidance, the instructions made clear that overlap was possible and provided a plain warning to curtail the resulting risk of double-counting: "Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss."

Taken together, the lack of definitions to distinguish among noneconomic-damages categories and the warning not to double-count

---

[11] The only other definition was of "parental consortium," which is relevant only to Juarez's damages: "'Parental consortium' means the positive benefits flowing from the parent's love, affection, protection, emotional support, services, companionship, care, and society."

necessarily gave the jury substantial discretion with respect to *how* it allocated the award. *Id.* at 775. The instruction was thus similar to the one examined in *Golden Eagle Archery, see id.* at 762, in which "[t]he jury charge permitted the jury to make its own determination of how to categorize and compensate the losses suffered[.]" *Id.* at 770.

Given this understanding, nothing in the new-trial order provides a proper ground to overturn the verdict, which awarded a substantial total amount of noneconomic damages. The order did not suggest—much less show—that, in so doing, the jury failed to account for or adhere to the instruction to avoid double-counting when it placed a zero in the category of past disfigurement. Nothing in the order explains why, for example, the jury could not have followed both the instructions and the evidence by linking two difficult-to-divide categories—past disfigurement and past pain and suffering—rather than disaggregating them.

A district court certainly may grant a new trial "when the damages are manifestly too small or too large," Tex. R. Civ. P. 320, but this order and this record do not implicate that principle. When the rule applies, it means that a court may require a new trial when a record cannot sustain damages that are either too large *or* too meager.[12] But Rule 320 is not an invitation for a court to disagree with the jury—not even close. Rather, it authorizes the court, as a last resort, to take action if a jury has clearly departed from its function as a rational factfinder. And from *Columbia* onward, our new-trial precedents make clear that the explanation accompanying a new-trial order on this ground must show, based on the

---

[12] Another option available to the court when the damages awarded are manifestly "too large" is to suggest a remittitur. *See* Tex. R. Civ. P. 315.

20

evidence and consistent with the record, why no rational jury could have exercised its discretion as this jury did.

Nothing in the new-trial order here, however, explained why the jury could not have rationally divided damages among the overlapping categories as this jury did, how that division was a departure from the instructions that bound the jury, or how the total amounts awarded remotely fail the requisite legal standard. Particularly with respect to noneconomic damages, which are less susceptible to precise measurement or even distinction from each other, the fact that a verdict awards zero damages for some categories (or here, just *one*) cannot provide a valid basis for a new trial when the jury has compensated the plaintiff through other, related categories, unless the noneconomic damages for all related categories are manifestly too small. *See, e.g., Golden Eagle Archery*, 116 S.W.3d at 771–74. Particularly given the *total* award, the new-trial order's attacks on specific findings do not approach the level that is required for the solemn act of displacing a jury's considered decision.

This insufficiency of the explanation brings us to our final point with respect to the damages for Villegas. Specifically, aside from its inability to satisfy merits review, the new-trial order would still be insufficient because it does barely more than make "reference to the evidence," *Bent*, 487 S.W.3d at 183, without explaining *how* any evidence shows the jury's answers were so far astray that the verdict could not be regarded as anything but manifestly unreasonable. Forceful and principled disagreement with a jury does not equate to showing that the verdict was untethered from the evidence. When an order cannot make that showing, it amounts to mere disagreement, which under our system

21

is one basis on which judges may never rely to overturn a verdict. *See, e.g.*, *Columbia*, 290 S.W.3d at 210.

Said more simply, in *United Scaffolding*, we held that the new-trial order must "elaborate, with reference to the evidence adduced at trial, *how* the jury's answers are contrary to the great weight and preponderance of the evidence." 377 S.W.3d at 690 (emphasis added). Much like several of the purported reasons for a new trial there and in *Bent*, 487 S.W.3d at 178–84, the new-trial order did not do so here. As a matter of law, this principle would alone require us to disregard this ground for a new trial with respect to Villegas's damages.

We finally turn to Juarez's damages. The jury compensated Juarez $150,000 for the "[r]easonable value of household services and personal care that, in reasonable probability will be provided by Andrea Juarez for the benefit of Irma Vanessa Villegas in the future."[13] The jury did not compensate Juarez for that category in the past, and it declined to award her damages for the loss of past or future parental consortium. *See supra* Part I.

The new-trial order, however, says *nothing at all* that links the purported insufficiency of any of these damages to the evidence. Again, when supported by the evidence, awarding (or not awarding) damages is a classic question well within the jury's discretion, as the jurors alone

---

[13] Notably, the "household services and personal care" category of damages typically measures the lost services that, but for the injury, *the injured party* would have provided *to the plaintiff*. The charge in this case, however, asked the jury to measure the "[r]easonable value of household services and personal care . . . provided by *Andrea Juarez* for the benefit of *Irma Vanessa Villegas*." In other words, the jury had to assess the value of the services Juarez would have provided to her mother, not the amount that her mother (but for the injury) would have provided to her.

22

must assess the credibility of the witnesses and the weight to afford their testimony. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004).[14] The record's reflection of credibility problems for Juarez (such as her disproven contentions regarding Rudolph's termination of her mother's insurance) would allow a reasonable jury to doubt her credibility with respect to damages that relied upon her testimony. It is simply impermissible for the district court, no matter how strongly it disagrees, to substitute its own judgment for the jury's as a basis for a new trial. *See Toyota*, 407 S.W.3d at 756 n.6. A valid ground for a new trial requires far more than has been presented here.

\* \* \*

Subject to the presence of sufficient evidence, a jury always has significant authority to award or deny damages. *See, e.g.*, *Golden Eagle Archery*, 116 S.W.3d at 772 ("[W]hether to award damages and how much is uniquely within the factfinder's discretion."). Combining that authority with the express direction here to avoid double-counting makes mere disagreement with the jury's verdict even more clearly insufficient as a basis to overturn it. As a matter of law, the jury's choice (among others it could have made regarding how to award and allocate the damages) was within its discretion because it was supported by the evidence and consistent with the instructions. At the very least, a new trial could not

---

[14] The injury to Villegas, and derivatively to Juarez, was clear and tragic. But "[i]n keeping with the principles that a court may not substitute its judgment for that of the jury and that the jury is the sole judge of the weight and credibility of testimony, courts should not conclude that a jury's failure to award any damages . . . is against the great weight and preponderance of the evidence simply because there is objective evidence of an injury." *Golden Eagle Archery*, 116 S.W.3d at 774.

be ordered for the stated reasons without transgressing the line separating the authority of the court from that of the jury.

**3**

The third reason, reproduced here, is likewise not a proper ground for a new trial:

> As an additional and independent basis for new trial, the Court finds that the Texas Supreme Court decision in [*Painter*] rendered . . . the day of this Jury Verdict, was important law that affected the earlier decision s [*sic*] of this Court on motions filed by the parties, the evidence presented at trial and the charge given to the Jury. Based on the Painter opinion . . . it appears to this Court that it needs to reconsider whether Irma Vanessa Villegas and Christian Ruiz were injured in the course of employment as a matter of law which would make Plaintiff's claim a non-subscriber negligence case under 406.33 of the Texas Labor Code, and combined with the evidence admitted at trial, find negligence as a matter of law, thereby leaving only the issue of damages for determination.

It is true that this Court issued its opinion in *Painter* on the same day the verdict in this case was reached. But we cannot see, and the new-trial order does not explain, how that coincidence of timing could have any material effect. Both *Painter* and this case address whether an employee was acting within the course and scope of employment, but here, the jury found *for plaintiffs* on that point involving a far different fact pattern and upon very pro-plaintiff instructions. The jury found that Flores was acting within the scope of his employment and that Ruiz and Villegas were not, but it is not plausible that *Painter*'s holding could have changed that outcome. This Court's decision in *Painter* turned on our rejection of a "task-by-task" test in determining when the course-and-

24

scope standard is met. 561 S.W.3d at 133–34. *Painter* has no material bearing on any question pertinent to *this* case, such as the application of the access doctrine within the course-and-scope question.

The new-trial order suggests, without much analysis, that some "matter of law" determinations might have been different had *Painter* been decided earlier. Post-trial proceedings provide the proper vehicle to assess such purely legal questions and to determine the effects of whatever legal conclusions the court might reach. Accordingly, like the other two grounds that involve legal questions, this ground does not warrant a new trial.

**B**

The district court's final reason for its new-trial order, the improper expert testimony, presents a different kind of error—one heavily dependent on the district court's discretion in managing the conduct of the trial. *See United Scaffolding*, 377 S.W.3d at 688. Trial judges are entitled to great deference with respect to assessing the consequences of improperly admitted testimony, *see id.*, which can properly inform a trial court in exercising its authority to grant a new trial.

As we said in *Columbia*, "Texas trial courts have historically been afforded broad discretion in granting new trials. But that discretion is not limitless." 290 S.W.3d at 210. The very concept of discretion is one that entails some limits—hence the corresponding concept of the *abuse* of discretion. "Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." *Martin v. Franklin Cap. Corp.*, 546 U.S.

25

132, 139 (2005). It is hard to imagine when this principle would require more respect than in this context, given "the significance of the issue—protection of the right to jury trial[.]" *Columbia*, 290 S.W.3d at 209. When the exercise of discretion would wipe away a jury verdict that otherwise appears to be well supported—including because of an unusually robust curative instruction by the district judge—the need for careful review remains high even if it is deferential. We conclude that the record does not support this ground for a new trial.

**1**

Before trial, the district court granted a motion in limine to prohibit references to Villegas's drinking habits. That ruling aimed to prevent the jury from conflating any alleged habits with the consumption of alcohol on the day of the accident. Throughout three long weeks of trial, all had proceeded well, including the parties' and witnesses' adherence to the order in limine.

Thus, the end was in sight when Rudolph called the case's last witness: Dr. Gary Wimbish, an expert toxicologist. The course of the trial changed when plaintiffs' counsel asked Wimbish about Rudolph's allowance of alcohol on the premises and the source of the beer on the day of the tragedy.[15] Wimbish responded with statements that were based on

---

[15] Generally, the party complaining of improper argument before a jury must not have invited or provoked the improper argument. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). Following the testimony reproduced below, the court at one point told plaintiffs' counsel that "you invited the error." Counsel argued why she disagreed. Ultimately, the judge concluded that it was "a tough decision," that he would not grant the mistrial, but that he would give the limiting instruction that we discuss below. We need not resolve whether the testimony was invited error; for purposes of

what he had heard regarding Villegas's alleged practice of bringing alcohol to work and needing it to sleep. The brief cross-examination testimony relevant to this point unfolded as follows, with plaintiffs' counsel asking and Wimbish responding:

> Q. The alcohol [Villegas] consumed was consumed on the premises of Rudolph Mazda?
>
> A. And that's the only information I have.
>
> Q. And the information that you have includes that the alcohol was allowed by Rudolph's head person in charge on that night?
>
> A. My information is a bit different from that.
>
> Q. What information do you have that's different from that?
>
> A. Well, in the information that I have received, she brings alcohol with her to work, and —
>
> Q. Who?
>
> A. — and it's the information that I have — and had been drinking out of her cup on her own supply of alcohol that day.
>
> Q. So you are taking the testimony of Lisa Melbourne who said — is that where you're getting that from?
>
> A. I don't remember the exact person, but that information was available to me. And then there's clinical information — and I'm not being derogatory. I'm just trying to say this is information that I considered. Okay? She verified in her statement she may have a problem with alcohol because having to wake up in the middle of the night and drink alcohol so she can go back to sleep.
>
> Q. Okay, sir. I'm not — Yeah. Can we approach actually?

our decision, we assume that it was not.

27

Immediately after this testimony, plaintiffs' counsel moved for a mistrial, which the district court ultimately denied. The district court then responded to the problem by giving an unusually robust curative instruction to the jury:

> You heard testimony from the witness that is not credible, is unreliable, and not evidence in this case. You are instructed to disregard the witness's testimony—Dr. Wimbish's testimony—on all evidence concerning Vanessa Villegas'[s] prior use of alcohol before . . . this incident. Do you understand that, ladies and gentlemen?

After giving that instruction, the judge asked each juror, one by one, to confirm that they could and would follow the instruction. Each juror affirmed that he or she could and would.

No one defends the testimony as affirmatively proper. And although it was short—a brief flicker within the three weeks of trial—it was also palpable. The question we must answer, however, is whether that improper testimony can form the basis for a new-trial order. We conclude that it cannot.[16]

---

[16] An appellate court would not reverse a judgment because of the improper testimony unless its presence "probably caused the rendition of an improper judgment." Tex. R. App. P. 44.1(a)(1). The real parties in interest argue that we should relax that standard in our review of new-trial orders because of the discretion given to a trial court. They propose that a new-trial order should be upheld if the error "reasonably" (instead of "probably") "could have caused the rendition of an improper judgment." However, we have repeatedly referenced Rule 44.1(a)(1)'s "probably" standard in cases involving the review of new-trial orders. *See, e.g.*, *United Scaffolding*, 377 S.W.3d at 688–89; *Toyota*, 407 S.W.3d at 756; *Bent*, 487 S.W.3d at 176. In any event, the curative instruction was sufficiently robust that the new-trial order could not be upheld on this ground even under the real parties' proposed standard.

## 2

The instruction that the court gave was harsh and clear. One may wonder if the jury, hearing the court's denunciation of the expert, gave much heed to *anything* he had said. Nonetheless, in granting the new trial, the district court reasoned:

> [a] As an additional and independent basis for new trial, the Court finds that defense expert Gary Wimbish intentionally injected unreliable double hearsay, non-responsive to the question asked him in an attempt to inject an improper inference before the jury. [b] Though the Court did admonish the witness as well as instruct the jury to try to eliminate the harm, [c] it is obvious to this Court that the harm done could not be eliminated or removed. The Court finds this improper evidence and behavior to impugn the character of Irma Vanessa Villegas did cause the rendition of an incorrect verdict by the Jury as [d] the evidence showed Irma Vanessa Villegas was a hardworking dependable and responsible mother, grandmother and sister; there was no negative evidence or detracting evidence other than expert Wimbish's testimony.

(Brackets added.) The brackets are added to indicate the four key parts of the explanation:

> [a]   deeming the testimony to have been improper and intentional;
>
> [b]   acknowledging the curative instruction;
>
> [c]   declaring it "obvious . . . that the harm done could not be eliminated or removed" and that this harm manifested in an incorrect verdict; and
>
> [d]   providing the judge's own characterization of the evidence concerning Villegas.

In parts [a] and [b], the district court reasonably characterized the testimony as wrongful, concluded that it was intentional (a finding that

29

we accept for present purposes), and acknowledged the need for a curative instruction, which it gave. Part [d] is at best neutral, although it may even suggest a forbidden motive—that the judge thought highly of Villegas and would have awarded more than the jury did.

We focus our analysis on part [c], which is where the order's analysis falters. Central to the finding is that "the harm could not be eliminated or removed." Our law and indeed our entire jury system have long depended on the opposite presumption: that, absent a compelling rebuttal, curative instructions *do* work. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008); *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968); *Dennis v. Hulse*, 362 S.W.2d 308, 309 (Tex. 1962); *Wade v. Tex. Emp. Ins. Ass'n*, 244 S.W.2d 197, 200–01 (Tex. 1951).

Indeed, even in the rare instances where we have found incurable argument, we have emphasized how much of an exception to the rule it is: "Typically, retraction of the argument or instruction from the court can cure any probable harm, but *in rare instances* the probable harm or prejudice cannot be cured." *Living Ctrs.*, 256 S.W.3d at 680 (emphasis added). There, argument presented to a jury compared Living Centers' lawyers to those facilitating a Nazi program during World War II, in which elderly or impaired people were used for medical experimentation and then killed. While we concluded that this qualified as the rare example of incurable argument, we reiterated that the standard remained high: "To prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove

30

its effects." *Id.* at 680–81. To avoid any doubt, we again said it clearly: "Incurable argument is . . . rare." *Id.* at 681.

The year after *Living Centers*, we rejected an incurable-argument claim by pointing to the same standard that we had used in that case. In the subsequent case, *Phillips v. Bramlett*, a doctor demanded a new trial because of improper argument about the need to "send a message" in *his* case because different juries had been insufficiently harsh in *other* medical-malpractice cases. 288 S.W.3d 876, 882–83 (Tex. 2009). The jury returned a substantial verdict.

We addressed the very contention relied upon in the new-trial order here: that the repeatedly made statements were incurable. We agreed that the argument was indeed improper. But we briskly rejected the notion that it could reasonably be deemed incurable. *Id.* at 883. "As we recently observed, incurable argument is that which strikes at the very core of the judicial process." *Id.* (citing *Living Ctrs.*, 256 S.W.3d at 681–82). "The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Id.* (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (Tex. 1954)). These examples illustrate the general boundary line. Repeatedly telling jurors that they would align themselves with Nazis if they ruled for the defense could not have been cured; urging a jury to send a message responding to too-low verdicts could have been.[17]

---

[17] The Court in *Phillips* divided 5 to 4, but the dissent exclusively focused

In *Phillips*, we concluded that the defendant did not preserve error but that an instruction would have provided that cure had it been sought. *Id*. Here, by contrast, the plaintiffs *did* object, and the district court provided substantial time to hear all parties regarding the testimony. It then issued the stern curative instruction to the jury.

The testimony at issue here cannot reasonably be deemed inherently incurable. The trial was long and the offending statements were short. The jury knew all along that Villegas had been drinking; it was not under the impression that she was a teetotaler before Wimbish's testimony. Wimbish himself revealed that he was not quite sure of the source of his unreliable information, thus undermining its credibility. The testimony was not harmless—but we cannot agree that it was *incurable*. The district court's cure, moreover, was potent, leaving no doubt about how little credit the statements warranted and the level of contempt that the judge himself had for them. The instruction denigrated Wimbish as unworthy of credence and as unreliable; it all but invited the jury to disbelieve every word he said.[18]

If the curative instruction here could not cure the effect of Wimbish's ill-chosen sentences, then nothing could. And if that is so, then a trial court could deem nearly any improper testimony in any trial incurable. After all, especially for those that are lengthy, a trial without

_____

on a different issue and did not register any disagreement as to the effect of the improper argument. *See* 288 S.W.3d at 884–86 (O'Neill, J., dissenting).

[18] A curative instruction could be *too* potent—a cure worse than the disease. We are not asked to assess whether the instruction here was excessive or to overrule the new-trial order on that ground. We reserve for future cases, if needed, further discussion of the proper bounds of curative instructions.

some problem is hen's-teeth rare. Trials involve high stakes and high pressure. Non-lawyers' participation and utterances can be unpredictable. Although curative instructions as robust as this one are infrequent, more basic curative instructions are not especially uncommon. They typically consist of "sustain[ing] the objection . . . and instruct[ing] the jury to disregard." *Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 652 (Tex. 1977).

Perfection is not the standard a trial or appellate court could reasonably demand. Our system of jury trials would break down if the kind of cure supplied here were not usually sufficient. If, *without more*, a court that was determined to order a new trial could simply claim that it was "obvious" that a curative instruction could not work, *Columbia* and its progeny would be at their end. A new formula would replace "in the interests of justice and fairness." We would be right back where we were fifteen years ago in an age of nearly unfettered discretion. *See, e.g.*, *Cummins v. Paisan Constr. Co.*, 682 S.W.2d 235, 236 (Tex. 1984).

In fact, our jurisprudence would be *worse* off than before we started requiring explanations in *Columbia*. The presumption that jurors follow curative instructions—forceful ones like this especially—is not a featherweight to be disregarded without some powerful reason. Our judicial system's confidence in jurors' ability to make weighty decisions rests on our confidence that they follow all the requests we impose on them, including curative instructions.[19] The jury charge is such a

---

[19] *See, e.g.*, *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) ("The jury is presumed to have followed the court's instructions."); *Barker v. Eckman*, 213 S.W.3d 306, 313 (Tex. 2006) (noting that an appellate court's factual-sufficiency review "presumes that the jury acted in

significant part of trial practice precisely because we believe, perhaps sometimes aspirationally, that the jury will follow every single word, and thus every single word is chosen with care. No court may indulge a presumption that the jury did not follow instructions.

Nonetheless, the presumption that the jury *did* follow the court's instructions, while powerful, is rebuttable. To rebut it, however, there must be some reviewable explanation for why courts can reliably conclude that *this* jury, unlike most, was incapable of following instructions. *That* conclusion is what a new-trial order grounded on testimony like Wimbish's must explain. A new-trial order could satisfy that requirement in at least two ways.

First, sometimes—but rarely—statements will be so incurably harmful as a matter of law that a new trial is inexorably required, as in *Living Centers*. Qualifying pollutive statements, we have said, may include remarks of racial prejudice, unsupported and extreme attacks on opposing parties and witnesses, or accusing opposing parties of witness manipulation or evidence tampering. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex. 1979). We do not suggest that list to be comprehensive (nor, on the other hand, that anything that barely satisfies

---

accordance with the trial court's instructions"); *Golden Eagle Archery*, 116 S.W.3d at 771 ("Unless the record demonstrates otherwise, an appellate court must presume that the jury followed [the court's] instructions."); *In re K.R.*, 63 S.W.3d 796, 800–01 (Tex. 2001) ("[W]e must assume, absent any evidence to the contrary, that [the jury] could . . . follow the trial court's instruction and draw no improper conclusions from seeing [a party] sitting in handcuffs."); *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex. 1982) (holding that a "limiting instruction" that evidence could be considered only for a specific purpose must be presumed to have been followed); *Gillette Motor Transp. Co. v. Whitfield*, 200 S.W.2d 624, 626 (Tex. 1947) ("Presumably, the jury understood and followed the instructions of the court.").

34

one of those requirements would be inevitably fatal to the entire trial, like a single drop of poison in a cup of water in a detective story).  A new-trial order predicated on this ground can simply identify the statement, describe the context, and apply settled law deeming the statement incurably harmful.

Second—and also rare—testimony, evidence, or argument that is not inherently incurable may prove incurable in a particular trial.  One reason for reposing discretion in trial courts is their ability to identify those rare cases.  But a new-trial order predicated on this ground must explain *why* the otherwise-curable problem (like the expert testimony here) was nonetheless not susceptible to cure (by the instruction, such as the one here, that was given).  That explanation—like any explanation for a new trial—must satisfy the requirements of our cases.

Various kinds of circumstances, if supported, might justify a new trial in this context, but those circumstances are not present here.  For example, a court may find the jury unwilling to accept a curative instruction, ranging from inattention to open defiance.  Nothing in this record, however, shows that the jurors were anything other than willing recipients of the court's guidance.  In other cases, repeated and extensive violations of the same order in limine might suggest a more conscious intent.  But here, Wimbish's brief testimony was the sole violation mentioned, and as the court's own new-trial order says, plenty of other evidence (that was not subject to a curative instruction) painted a positive image of Villegas.  In yet other cases, a verdict that was manifestly too small (or large) might be analytically linked to improper evidence or argument.  If, for example, one defendant who in all other respects was

35

similarly situated to others received much harsher treatment from the jury following a prejudicial and inflammatory outburst about his personal life, that disparity might contribute to a conclusion that the cure was ineffective. But here, the jury's verdict was *favorable* to the plaintiffs and imposed liability and substantial damages. The jury awarded plaintiffs some $4 million and found Villegas less responsible than Ruiz.

Examples like those, of course, do not delimit the universe of possible reasons that a new trial might be warranted. Nor do we suggest that identifying any of them would automatically justify a new-trial order. Our point is only that the new-trial order here does not identify *anything* to satisfy the requirements of our case law. The order simply declared it "obvious" in the court's view that the cure did not work. We cannot accept such a conclusory statement, despite our reaffirmation of the deference that we afford to trial courts.[20]

While this Court is deferential to the determinations of trial courts with respect to the conduct of their trials, discretion cannot override every other consideration. Two in particular weigh heavily against a new-trial order grounded on a purportedly ineffective curative instruction: first, the general importance of the jury-trial right, which has animated all our cases from *Columbia* onward, and second, the specific need to adhere to the presumption that juries follow the court's directions until proven

---

[20] Although we find the new-trial order to be an abuse of discretion, we hasten to add that we do *not* hold that a district court can never change its mind after denying a motion for mistrial. Attempting to resolve a problem with a curative instruction is sound judicial management, but judges remain free to reconsider, particularly as more information becomes available. We certainly do not doubt the wisdom of proceeding to verdict when a problem comes so late in the proceedings, as it did here. In short, terminating the first trial early via a mistrial is *not* a trial court's only chance to grant a new trial.

otherwise. Because the new-trial order does not have record support—and certainly not enough to overcome these principles—we conclude, as a matter of law, that this stated ground does not support a new trial.

## IV

As we have previously acknowledged, "most trial judges are understandably reluctant, after presiding over a full trial, to do it all over again." *United Scaffolding*, 377 S.W.3d at 687. A new-trial order is strong medicine—and when trial courts prescribe that remedy, they must partake in it too. We recognize that new-trial orders are not issued lightly, and we do not disturb them lightly, either. But no new trial is warranted here. Proceeding with the ordinary post-trial process will avoid potential infringement on the parties' jury-trial right and save them, the witnesses, the public, and the judicial system the massive expense and inconvenience of an unneeded second trial.

We therefore conditionally grant mandamus relief and direct the district court to vacate its new-trial order, harmonize the verdict, and proceed in the normal course with the post-trial stages of litigation. We are confident that the district court will comply, and the writ will issue only if it does not.

_____
Evan A. Young
Justice

**OPINION DELIVERED:** June 16, 2023

37