**Opinion filed August 23, 2023**



## In The

# Eleventh Court of Appeals

_____

## No. 11-23-00112-CV
_____

## IN RE TEXAS DEPARTMENT OF TRANSPORTATION

**Original Mandamus Proceeding**

## M E M O R A N D U M   O P I N I O N

On May 7, 2017, Marleigh Patterson lost control of her vehicle while negotiating a curve on Farm-to-Market Road 1226 in Jones County. The vehicle skidded off the roadway and hit a tree, injuring Patterson. Tragically, Patterson's two-year-old daughter, who was a passenger in the vehicle, was killed. Following the accident, Patterson gave varying accounts of the reason that she lost control of the vehicle, none of which related to the condition of the roadway. She also admitted that she was traveling at a speed that was more than the posted limit as she approached the curve.

Patterson and Christopher Cumpton, the father of the minor, sued the Texas Department of Transportation (TxDOT), alleging that the accident was caused by

inadequate maintenance on a portion of the roadway near the crash site. The jury returned a finding of "no" on the question of TxDOT's negligence and a finding of "yes" on the issue of Patterson's negligence. After the trial court entered a judgment in favor of TxDOT based on the jury's verdict, Patterson filed a motion for a new trial, arguing that the evidence was factually insufficient to support the jury's answers. The trial court granted the motion.

In this proceeding, TxDOT asks us to order the trial court to vacate the order granting a new trial. We conditionally grant the writ of mandamus.

*Background Facts*

Patterson and Cumpton tried the case on the theory that Patterson lost control of the vehicle after her right tires dropped off a portion of the curve that was substantially eroded. They maintain that the erosion constitutes a special defect and that TxDOT was negligent in either failing to repair the roadway and/or failing to warn of the danger. *See* TEX. CIV. PRAC. & REM. CODE § 101.022 (West 2019) (limiting a governmental unit's duties for a premises defect to those that are owed to a "licensee" of private property, except for certain "special defects" on highways, roads, and streets).

A diagram that was prepared by Texas Department of Public Safety Sergeant Justin Tabor highlights an area of erosion along the right side of the curve. According to the diagram, the erosion ends about one-hundred feet before skid marks appear on the roadway and over two-hundred feet from the crash site.

At trial, Patterson testified that she had no recollection of encountering erosion on the roadway at the time of the accident, and no other eyewitnesses were called to support the theory that the erosion had caused Patterson to lose control of her vehicle. Instead, Patterson and Cumpton relied on the opinions of various DPS

2

personnel to support their theory of causation. These witnesses included Trooper Daniel White, who prepared the DPS investigation report.

TxDOT alleged, among other things, that Patterson's speed exceeded the posted limit of seventy miles per hour at the time of the incident. Patterson testified that her cruise control was set at seventy-three or seventy-four miles per hour as she approached the accident site. Additionally, TxDOT solicited testimony from Bill Nalle, a mechanical engineer and accident reconstruction expert, who indicated that Patterson was traveling more than eighty miles per hour when the vehicle began to skid.

In response to the question of whether the negligence of TxDOT was a proximate cause of the occurrence in question, the jury answered "no." In response to the question of whether the negligence of Patterson was a proximate cause of the occurrence in question, the jury answered "yes." Based on this verdict, the trial court rendered a take-nothing judgment in favor of TxDOT. This judgment was later vacated when the trial court granted Patterson's motion for new trial.

*Analysis*

In its first two issues, TxDOT asserts that the trial court abused its discretion in determining that the evidence was factually insufficient to support the jury's finding of "no" with respect to TxDOT and "yes" with respect to Patterson.[1]

The Texas constitution provides that the right to trial by jury "shall remain inviolate." TEX. CONST. art. I, § 15. For that reason, a trial court's order must provide meaningful reasons for setting aside a jury verdict. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 214 (Tex. 2009) (orig.

---

[1]TxDOT also asserts a third issue, arguing that the trial court abused its discretion in substituting its own judgment for that of the jury. We believe that this question is already subsumed within the first two issues, and we therefore do not address it as a separate matter.

proceeding); *see also In re Rudolph Auto., LLC*, No. 21-0135, 2023 WL 4035804, at *4 (Tex. June 16, 2023) (orig. proceeding) ("*Columbia* stands initially for the principle that it is an abuse of discretion to grant a new trial if the order is not accompanied by meaningful reasons.").

We conduct a merits-based review of the order based on the explanation that is given by the trial court. *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 749 (Tex. 2013) (orig. proceeding); *In re Whataburger Rests. LP*, 429 S.W.3d 597, 598 (Tex. 2014) (orig. proceeding). If the record does not support the trial court's rationale, mandamus will issue. *See Toyota*, 407 S.W.3d at 749; *Whataburger*, 429 S.W.3d at 598.

Mandamus is warranted when the trial court clearly abused its discretion, and the relator does not have an adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). "[T]here is no adequate remedy by appeal when a district court issues an erroneous new-trial order." *Rudolph*, 2023 WL 4035804, at *3 n.5. As a result, the only question in this proceeding is whether the trial court's new-trial order was an abuse of discretion. *Id.*; *see In re Bent*, 487 S.W.3d 170, 178 (Tex. 2016) (orig. proceeding). A trial court does not abuse its discretion so long as its stated reason for granting a new trial is legally appropriate and specific enough to indicate that the trial court derived its reasons from the particular facts and circumstances of the case at hand. *Whataburger*, 429 S.W.3d at 598.

When a party challenges the factual sufficiency of a finding on which it has the burden of proof, it must show that the decision is so against the great weight and preponderance of the evidence as to be manifestly unjust, "shock the conscience, 'or clearly demonstrate[] bias.'" *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019)

(quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). When a party challenges the factual sufficiency of a finding on which it did not have the burden of proof at trial, it must demonstrate that the evidence in support of the finding is so weak as to be clearly wrong and unjust. *Patel v. Ambassador Drycleaning Co.*, 86 S.W.3d 304, 307 (Tex. App.—Eastland 2002, no pet.).

In either scenario, we consider and weigh all of the evidence in a neutral light, keeping in mind that the jury acts as the sole judge of the weight and credibility of the testimony. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (courts must consider and weigh all evidence); *see* TEX. R. CIV. P. 226a (III) (mandating instruction to jurors that they are the "sole judges of the credibility of the witnesses and the weight to give their testimony"); *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex. 1993) (quoting the instruction in Rule 226a (III) in the context of a factual sufficiency challenge); *Humphrey v. Am. Motorists Ins. Co.*, 102 S.W.3d 811, 814 (Tex. App.—Eastland 2003, pet. denied). In other words, the trial court should not substitute its judgment for that of the jury. *Windrum*, 581 S.W.3d at 781; *see Rudolph*, 2023 WL 4035804, at *4 ("No level of the judiciary has the authority to repudiate a determination, predicated on the presence of probative evidence, made by a properly constituted and instructed jury in response to a properly submitted question."); *Jaffe*, 867 S.W.2d at 28 ("[A] court of appeals may not set aside such a finding merely because the judges believe that they would have reached a different and more reasonable result had they been jurors.").

### TxDOT's Negligence

The trial court determined that the condition of the roadway at the time of the incident would be treated as a "special defect" under section 101.022 of the Civil Practice and Remedies Code. As such, the duty of care that was owed by TxDOT under these circumstances is the same duty of care that a private landowner owes to

its invitees.  *Denton Cnty. v. Beynon*, 283 S.W.3d 329, 331 (Tex. 2009); *Tex. Dep't of Transp. v. Lopez*, 436 S.W.3d 95, 102 (Tex. App.—Eastland 2014, pet. denied). That is, TxDOT must use ordinary care to protect drivers and their passengers from a dangerous condition of which it is or reasonably should be aware.  *Beynon*, 283 S.W.3d at 331; *Lopez*, 436 S.W.3d at 102.  TxDOT is liable for negligence if it failed to reduce or eliminate the risk, and the condition was a proximate cause of the injuries in question.  *See Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998)

We conclude that the jury's decision was supported by factually sufficient evidence with respect to at least three elements of Patterson and Cumpton's claim for negligence and that the trial court abused its discretion when it determined that the jury's answer of "no" was against the great weight and preponderance of the evidence.  *See Windrum*, 581 S.W.3d at 781.

*A. Unreasonable Risk of Harm*

Patterson and Cumpton were tasked with proving that the condition of the roadway created an unreasonable risk of harm.  *Beynon*, 283 S.W.3d at 331.  In support of their contention that the roadway was unreasonably dangerous, Patterson and Cumpton argued that the erosion on the roadway created a substantial edge drop-off along the right side of the curve and that it also narrowed the roadway to an unreasonable degree.

With respect to the drop-off, Trooper White testified that, at one point, the depth of the drop-off was about five and one-half or six inches.  David Steitle, a professional engineer, testified that the condition of the road was "a needless danger to the public" and that he found the drop-off effect of the eroded area to be dangerous, in that "once [drivers] go off that edge . . . you're down in that hole."

6

Daniel Richardson, the Director of Operations for the Abilene area for TxDOT, testified that, under TxDOT guidelines, an edge drop-off condition of three inches or less is considered to be "tolerable." However, he added that TxDOT is also concerned with a second condition—a "slope" condition. The slope condition is a description of the tilt or angle of the vehicle to either the right or the left once it has dropped off the edge. Richardson indicated that a slope condition should maintain a forty-five-degree angle or less.

Richardson indicated that the photos that allegedly reflected a five-and-a-half to six-inch drop-off condition were instead measuring a slope condition because the measurement was taken several inches outside of the edge drop-off point. He added that it was difficult to determine exactly how far from the edge the photographs were taken, although he estimated that it was six to twelve inches.

Justin Tabor is a sergeant for the Texas Department of Public Safety. He created a scale diagram of the roadway and accident scene. Sergeant Tabor testified that the total width of the roadway at the location of the erosion is 18.98 feet. He also testified that the width of Patterson's lane at its narrowest point is 8.32 feet. TxDOT expert Bill Nalle indicated that the width of Patterson's vehicle was less than six feet, leaving approximately two feet of clearance through the eroded section of the curve.

The employees of TxDOT and DPS generally agreed that the eroded section of the highway needed repair. However, opinions varied as to whether the roadway was unreasonably dangerous. Trooper White stated that the erosion would "[n]ot necessarily" cause issues for drivers, although in his deposition he had indicated that, while trying to get back on the road "it was going to cause any vehicle a problem." Steitle testified that—based on the reduced width of the lane—the road was dangerous. On the other hand, Casey McGee, a TxDOT employee and professional

engineer said that the condition did not pose an unreasonable danger. Likewise, Nalle indicated that there was plenty of clearance for Patterson to negotiate the road. He also indicated that approximately a half-million vehicles went through this curve during the five years preceding the incident and that only two drivers (including Patterson) failed to successfully navigate the curve. This suggested to him that most drivers could safely traverse the curve.

In its order granting a new trial, the trial court concluded that the jury's decision was against the great weight and preponderance of the evidence based on the testimony that there was a significant edge drop-off, the testimony concerning the width of the lanes, and the opinions of several witnesses that the erosion constituted an unreasonably dangerous condition. However, the trial court also disregarded the evidence showing that thousands of motorists can and have readily traversed the curve without incident, as well as the conflicting opinion testimony that the condition was not unreasonably dangerous. In so doing, the trial court abused its discretion by failing to account for all of the evidence in the record. *See Pool*, 715 S.W.2d at 635.

Additionally, while the trial court acknowledges that there was a dispute over whether the measurements of the drop-offs were correct, it dismisses Richardson's critique of the DPS measurements because the "Defendant's own employees used the same method of measurement." The trial court's assessment of Richardson's testimony may reflect a rational conclusion. However, it is not the only conclusion that could be drawn from such testimony, nor is it the conclusion that was drawn by the jury. By rejecting the testimony of Richardson regarding the manner in which edge drop-offs should be measured, the trial court improperly substituted its evaluation of Richardson's credibility for that of the jury. *See Windrum*, 581 S.W.3d at 781; *Jaffe*, 867 S.W.2d at 28.

*B. TxDOT's Knowledge of the Condition*

In support of their argument that TxDOT knew or reasonably should have known that the roadway was unreasonably dangerous, Cumpton and Patterson pursued two lines of argument.

First, Cumpton and Patterson introduced evidence that TxDOT crews regularly inspected the roadway in question. Steitle testified that TxDOT will normally inspect all roadways once a month. McGee likewise stated that a once-a-month inspection is recommended by TxDOT, although it is not required. There was also evidence that a crew was working on a repair near the site of the accident approximately two weeks earlier, although there was no direct indication that they noticed the condition of the roadway.

Regardless of when any inspections were made, it was not clear how the erosion had developed over time, nor was there direct testimony about the road's condition the last time it was seen or inspected by TxDOT. For example, McGee testified that roads can "blow up" in as little as one day. For that reason, he could not say that the road had been in the same condition for longer than a month. Richardson likewise stated that deteriorated edges can develop "in a matter of hours to days to months to years."

Cumpton and Patterson also sought to show that TxDOT was made aware of deterioration in the roadway following a separate accident that occurred approximately one year earlier on April 7, 2016. On that date, Johnathin Kratz lost control of his 2005 Chevrolet Malibu while navigating the same curve. According to Kratz and Hanna Colley, who was a passenger in the vehicle, the car encountered deterioration in the road, causing Kratz's tire to "pop." Colley described the roadway as "being ate out." She also stated that the accident happened because "[t]he pavement was gone," adding that Kratz "would have been on the road if [the

pavement] would have been there." After hitting the deteriorated roadway, the vehicle went into a slide, hitting a culvert, and flipping over before landing on its wheels.

There were no serious injuries in the 2016 incident. However, the incident was reported to DPS, and Trooper Brian Waggoner was dispatched to the scene. Sergeant Charles Wheeler, who was a DPS supervisor at the time, also went to the scene. Both of them observed the deteriorated condition of the roadway and determined that it was the cause of the wreck. After inspecting the scene, Sergeant Wheeler left a voicemail for Jeffrey, who was the TxDOT maintenance supervisor for Jones County, letting him know about the problem. However, Sergeant Wheeler never followed up with Jeffrey, and Jeffrey testified that he never received a complaint about the roadway near the accident scene.

The trial court's order granting a new trial acknowledged that the record included contradictory evidence on the issue of TxDOT's actual or constructive knowledge. Among other things, it recognized the evidence that Jeffrey never received Sergeant Wheeler's voicemail, as well as TxDOT's argument that regular inspections might not have revealed the specific deficiency at issue. However, the trial court dismissed such evidence, indicating that it "lacked any serious credibility." In so doing, the trial court again substituted its judgment for that of the jury.

*C. Proximate Cause*

Patterson and Cumpton sought to prove the element of proximate cause based on the opinion testimony of Trooper White, although his opinion on the subject was not entirely clear. On direct examination, Trooper White indicated that he believed the road condition "had some cause" in the crash. However, on cross-examination, Trooper White stated that he could never make a determination of the exact cause.

10

This testimony was consistent with his report of the incident, which indicated that the accident had occurred when Patterson overcorrected her steering for an "undetermined reason."

Sergeant Tabor also testified that he believed Patterson left the road before she lost control of the vehicle. However, he could not identify the exact location where her tires went off the road, and his testimony on the subject was more limited than Trooper White.

None of the witnesses provided a first-hand account of how the accident occurred, including Patterson, whose recollection was limited. Patterson testified that, just before the accident, she had noticed headlights approaching from the opposite direction. She stated that she then heard a "crunch" sound and that the next thing she remembers is a person named Cody "shaking [her] awake" following the collision.

Patterson's testimony reflected only one of multiple accounts that she had given since the accident. Trooper White interviewed Patterson on several occasions following the incident. During those interviews, her explanation of events leading to the accident included the following: (1) that a person ran out on the road in front of her, (2) that an animal ran out on the road in front of her, (3) that a car had pulled out in front of her, and (4) that she was struck by a vehicle passing in the opposite direction. Although these accounts varied, Trooper White couldn't recall if Patterson ever stated during these interviews that the crash occurred because she "ran off the edge of the road."

Based on his investigation of the accident, Trooper White managed to eliminate all of the explanations that were given by Patterson, except for the possibility of an animal running into the road. He found an animal trail near the

scene of the incident and stated that he could therefore not rule out the possibility that an animal had run out into the road.

Nalle concurred with Trooper White's conclusion that the accident happened after Patterson overcorrected her steering. He added that any number of things could cause a driver to oversteer, including an animal, a pedestrian, or an oncoming vehicle. Nalle also testified that, in "run-off cases," it is typical for yaw marks to appear on the pavement "at a sharp angle right from the edge of the road" which is "not what we have in this case."

In its order granting a new trial, the trial court's assessment on the element of proximate cause is limited to passing references to the opinions of Trooper White and Sergeant Tabor. In so doing, the trial court again disregards important evidence on which the jury could have based its decision.

Because the trial court's assessment of TxDOT's negligence on the elements described above disregarded important evidence and substituted its judgment for that of the jury, the trial court abused its discretion when it found that the jury's answer of "no" on the issue of TxDOT's negligence was against the great weight and preponderance of the evidence.

*Patterson's Negligence*

We also conclude that, because the evidence supporting the jury's verdict as to Patterson's negligence was not so weak as to be clearly wrong and unjust, the trial court abused its discretion in granting a new trial on that basis. TxDOT sought to establish Patterson's negligence by demonstrating that she was speeding. TxDOT also argued that, even if Patterson's wheels left the road as a result of the erosion, Patterson was negligent in failing to slow her vehicle before returning to the road.

On the issue of Patterson's speed, counsel for TxDOT cross-examined her as follows:

12

Q. At the time of the crash how fast were you traveling?

A. I am not exactly positive. I had my cruise set.

Q. Okay. Do you recall making a deposition in this case?

A. Yes, sir.

Q. I'm going to bring your deposition.

. . . .

Q. Ms. Patterson, have you read that?

A. Yes, sir.

Q. And does that refresh your recollection?

A. A little bit, yes, sir.

Q. How fast were you traveling?

A. It says on here 73, 74.

Q. 73 or 74 miles per hour?

A. Yes, sir.

Q. And you had your cruise control set at that speed?

A. Yes, sir.

The trial court's order concludes that, while Patterson "acknowledged" her deposition statement, she "did not testify that she was traveling [seventy-three to seventy-four miles-per-hour] in her trial testimony." The order then suggests that, because TxDOT did not offer Patterson's deposition into the record, there was no testimony from Patterson regarding her speed. In so ruling, the trial court appears to assume that TxDOT was attempting to impeach Patterson based on a prior inconsistent statement. *See Fultz v. First Nat. Bank in Graham*, 388 S.W.2d 405, 408 (Tex. 1965) ("prior inconsistent statements are usable only for impeachment

13

purposes and are not substantive evidence of the facts stated").[2]   However, in this instance, Patterson's deposition was not used as a tool for impeachment.  Instead, it was used as a device to refresh her recollection.[3]  *See, e.g.*, *U. S. Fire Ins. Co. v. Skatell*, 596 S.W.2d 166, 170 (Tex. App.—Texarkana 1980, writ ref'd n.r.e.) (prior statement used to refresh recollection of witness).  After Patterson reviewed her deposition, there was no longer a need for her to be impeached.  Instead, she testified directly that her cruise control was set at seventy-three or seventy-four miles per hour

Nalle also testified as to the speed of Patterson's vehicle.  He indicated that, based on the nature of the impact and the length of the yaw marks prior to hitting the tree, he believes that Patterson was traveling between eighty-two and ninety-one miles per hour.  He added, however, that he doubts it was as high as ninety-one, and that he thought her speed was more likely in the mid-eighties.

The trial court's order acknowledged Nalle's opinion testimony regarding Patterson's speed.  However, it concluded that Nalle lacked credibility because, unlike Trooper White, he was not present at the accident scene and because he anticipated that the facts suggested a high-speed accident before he performed his calculations.  In so doing, the trial court once again disregarded the jury's role as the sole judges of the weight and credibility of the evidence.

The order granting a new trial also failed to account for a trial exhibit that contains an excerpt from the Texas Drivers Handbook.  The exhibit indicated that, when a vehicle has run off the road, the driver should not "swing back into the

---

[2]We do not comment on whether the holding in *Fultz* is applicable when the document used for impeachment is an oral deposition that could be independently read into the record.

[3]We note that, at the time of its ruling, the trial court did not have the benefit of the reporter's record, and that its order was based on the trial judge's recollection of the testimony.

pavement." Instead, the driver should gradually reduce speed and then—after checking for traffic—"carefully drive back onto the pavement."

The jury could have properly determined that Patterson was negligent based on the evidence of her speed, including her own admission. *See Barnett v. Collins*, 280 S.W.2d 639, 640 (Tex. App.—Waco 1955, no writ) (evidence that plaintiff was driving above the speed limit supported finding that he was negligent in striking defendant's vehicle). Furthermore, if the jury believed that Patterson's vehicle left the roadway as a result of the erosion, it could also have determined that she was negligent in failing to slow her vehicle so that she could regain control before returning to the road. As such, the evidence supporting the jury's verdict as to Patterson's negligence was not so weak as to be clearly wrong and unjust, and the trial court abused its discretion in granting a new trial on that basis. *See Patel*, 86 S.W.3d at 307.

*This Court's Ruling*

We conditionally grant TxDOT's petition for writ of mandamus and direct the trial court to vacate its order granting a new trial. Mandamus will issue only if Judge Hagler fails to act by September 11, 2023.

JOHN M. BAILEY
CHIEF JUSTICE

August 23, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

15